[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————

No. 20-12781

———————————

DAVID SOSA,

Plaintiff-Appellant,

*versus*

MARTIN COUNTY, FLORIDA,
SHERIFF WILLIAM SNYDER,
of Martin County, Florida in an official capacity,
DEPUTY M. KILLOUGH,
individually,
DEPUTY SANCHEZ,
individually,
JOHN DOE MARTIN COUNTY DEPUTIES,

Defendants-Appellees.

—————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:19-cv-14455-DMM

—————————————

Before William Pryor, Chief Judge, Wilson, Jordan, Rosenbaum, Jill Pryor, Newsom, Branch, Grant, Luck, Lagoa, and Brasher, Circuit Judges.

William Pryor, Chief Judge, delivered the opinion of the Court, in which Newsom, Branch, Grant, Luck, Lagoa, and Brasher, Circuit Judges, join.

Jordan, Circuit Judge, filed an opinion concurring in the judgment, in which Wilson and Jill Pryor, Circuit Judges, join.

Newsom, Circuit Judge, filed a concurring opinion, in which William Pryor, Chief Judge, and Lagoa, Circuit Judge, join.

Rosenbaum, Circuit Judge, filed a dissenting opinion.

William Pryor, Chief Judge:

This appeal requires us to decide whether an individual detained for three days based on mistaken identity for a valid arrest warrant has stated a claim for relief under the Fourteenth Amendment for his over-detention. Deputy sheriffs arrested David Sosa based on a warrant for another man of the same name, detained him, and released him when his identity was verified three days

later. Sosa sued the deputies for violating his alleged due-process right to be free from over-detention. But in *Baker v. McCollan*, the Supreme Court held that a detention due to mistaken identity "gives rise to no claim under the United States Constitution" when it lasts only "three days" and is "pursuant to a warrant conforming . . . to the requirements of the Fourth Amendment." 443 U.S. 137, 144–45 (1979). The district court dismissed Sosa's complaint for failure to state a claim. Because *Baker* squarely controls this case, we affirm and remand to the panel for the disposition of any remaining issues.

## I. BACKGROUND

This appeal is from a dismissal for failure to state a claim, *see* FED. R. CIV. P. 12(b)(6), so we accept the allegations of the complaint as true. *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).

The Martin County Sheriff's Department twice has arrested David Sosa based on an arrest warrant for a different man with the same name. In 2014, a deputy sheriff stopped Sosa, a resident of Martin County, Florida, for a traffic violation. The deputy checked Sosa's driver's license using the sheriff's computer system and discovered a warrant issued 22 years earlier in Harris County, Texas for another man named David Sosa. Although Sosa protested during the traffic stop that the wanted man's date of birth, height, weight, social security number, and tattoo information did not match his own identifiers, deputies arrested, detained, and

fingerprinted Sosa. After three hours, the sheriff's department confirmed his identity and released him.

Four years later, on Friday, April 20, 2018, another deputy sheriff checked Sosa's driver's license during a traffic stop and found the same Texas warrant. Again, Sosa objected that the identifiers listed on the warrant did not describe him. Sosa also told the deputies about the misidentification in 2014. Deputies arrested Sosa and brought him to the Martin County jail, where, despite Sosa's continued insistence to deputies and jailers that he was not the wanted man, his detention lasted three days over a weekend. On Monday, April 23, 2018, Sosa was fingerprinted, and the sheriff's department released him after the fingerprints confirmed that the warrant was for a different man.

Sosa filed a civil-rights action, *see* 42 U.S.C. § 1983, alleging violations of his rights under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment against Martin County; the Martin County Sheriff in his official capacity; Deputy Killough, the officer who arrested Sosa in 2018; Deputy Sanchez, an officer to whom Sosa protested his innocence during his three-day detention; and other unnamed deputies. Sosa alleged that the defendants "searched and detained and arrested him without probable cause or reasonable suspicion," that they took "an [u]nconstitutionally lengthy time" "to check [his] identity," and that the Sheriff and County "did not have adequate written policies, or train or supervise the deputies properly" to prevent Sosa's arrest.

The district court dismissed the complaint. *See* FED. R. CIV. P. 12(b)(6). It determined that Sosa had not plausibly alleged that the deputies had violated Sosa's rights under the Fourth or Fourteenth Amendments. And it held that because the deputies were not liable, there was no basis for liability against the Sheriff and County.

A panel of this Court affirmed in part and reversed in part. *Sosa v. Martin Cnty.*, 13 F.4th 1254, 1279 (11th Cir. 2021), *reh'g en banc granted, op. vacated*, 21 F.4th 1362 (11th Cir. 2022). The panel opinion explained that the arrest was reasonable under the Fourth Amendment, *id.* at 1266, and that Sosa's claims against the County and the Sheriff were not viable, *id.* at 1279. The panel majority also concluded that Sosa stated a valid claim for violating his "substantive due-process right to be free from continued detention after it should have been known that [he] was entitled to release," *id.* at 1266, based on our precedent in *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993). But the panel dissent concluded *Baker* foreclosed Sosa's over-detention claim. *Sosa*, 13 F.4th at 1279 (Luck, J., dissenting).

We voted in favor of rehearing the case en banc and vacated the panel opinion. *Sosa*, 21 F.4th at 1362. We instructed the parties to brief only issues related to the over-detention claim. And we heard oral argument only on those issues.

## II. STANDARD OF REVIEW

We review *de novo* a dismissal for failure to state a claim. *Henley*, 945 F.3d at 1326.

## III. DISCUSSION

Our decision begins and ends with *Baker*. There, Leonard McCollan "procured" a driver's license that bore his own picture but, in all other respects, the information of his brother, Linnie. 443 U.S. at 140. "Leonard, masquerading as Linnie, was arrested . . . on narcotics charges," "booked as Linnie," and "released on bail as Linnie . . . ." *Id.* at 140–41. Evidently, Leonard violated the terms of his bond because an arrest warrant was soon after issued for Linnie McCollan. *See id.* at 141. When Linnie ran a red light, the police checked his driver's license, discovered the warrant, and arrested him, despite his protests of mistaken identity. *Id.* On Saturday, December 30, 1972, the police defendants took custody of Linnie "until [Tuesday,] January 2, 1973, when officials compared his appearance against a file photograph of the wanted man and, recognizing their error, released him." *Id.* Linnie later filed a civil-rights action alleging a violation of the Fourteenth Amendment. *Id.* After the Fifth Circuit reversed a directed verdict against Linnie on the theory that the police must "mak[e] sure that the person arrested and detained is actually the person sought under the warrant," *McCollan v. Tate*, 575 F.2d 509, 513 (5th Cir. 1978), the Supreme Court reversed and held that he had no constitutional right not to be detained for three days:

> Absent an attack on the validity of the warrant under which he was arrested, respondent's complaint is simply that despite his protests of mistaken identity, he was detained . . . from December 30 . . . until January 2, when the validity of his protests was ascertained. Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution.

*Id.* at 143–44.

The *Baker* Court rejected Linnie's over-detention claim based on its consideration of only two criteria: the validity of Linnie's arrest warrant and the length of his detention. *Id.* It recognized that Linnie was "deprived of his liberty for a period of days," which spanned three days from Saturday to Tuesday. And it recognized that his detention was "pursuant to a warrant conforming . . . to the requirements of the Fourth Amendment." *Id.* at 144. It concluded based on these two facts that Linnie had no cognizable Fourteenth Amendment claim for over-detention.

As the Court explained, any other conclusion would read too much into the constitutional guarantee of due process. The Constitution does not guarantee that innocent people will never be arrested, so a detainee's claims of innocence are "largely irrelevant." *Id.* at 145. Nor does the Constitution guarantee that officers will "investigate independently every claim of innocence . . . based on mistaken identity." *Id.* at 146. When officers do investigate, the

Constitution does not guarantee an "error-free investigation." *Id.*
And regardless of whether errors are made, the Fourteenth
Amendment is not a constitutional bulwark against a few-days de-
tention, "[g]iven the requirements that arrest be made only on
probable cause [under the Fourth Amendment] and that one de-
tained be accorded a speedy trial [under the Sixth Amendment.]"
*Id.* at 145. Even though the Due Process Clause affords protections
to people deprived of their liberty, those protections do not extend
to detainees in Linnie's particular situation.

Under *Baker*, no violation of due process occurs if a de-
tainee's arrest warrant is valid and his detention lasts an amount of
time no more than the three days that Linnie was detained. *Id.* at
144. And both conditions are met here. Like Linnie, Sosa was ar-
rested pursuant to a valid warrant supported by probable cause un-
der the Fourth Amendment. *See id.* at 143. And like Linnie, who
was held from Saturday to Tuesday, *see* 443 U.S. at 144, Sosa was
held for three days from Friday to Monday. So, under *Baker*, Sosa
has no claim for a violation of his due-process rights.

*Baker*'s holding did not clarify when prolonged detentions
*unlike* Linnie's would give rise to a constitutional violation. The
*Baker* Court "assume[d], *arguendo*, that, depending on what pro-
cedures the State affords defendants following arrest and prior to
actual trial, mere detention pursuant to a valid warrant but in the
face of repeated protests of innocence will after the lapse of a cer-
tain amount of time deprive the accused of 'liberty without due

process of law.'" *Id.* at 145 (alteration adopted). But the Court did not decide that issue.

Neither do we. Like the *Baker* Court, we limit our inquiry to the material facts of the case before us. And as the *Baker* Court was "quite certain that [Linnie's] detention of three days over a New Year's weekend does not and could not amount to such a deprivation," *id.*, we are sure that Sosa's commensurate three-day detention did not violate the Fourteenth Amendment. We need not go any further.

That *Baker* did not draw a bright line between lawful and unlawful detentions does not mean that it instituted a fact-intensive, totality-of-the-circumstances analysis for over-detention claims, as our dissenting colleague proposes. *See* Dissenting Op. at 34–40. Of course, there are some factual differences between *Baker* and this case. For example, Linnie was detained over a holiday, 443 U.S. at 141, and Linnie's detention began in 1972, when technology was less advanced and identification may have taken longer, *id.* at 141. But the Court did not treat these facts as material. *See id.* at 143–44. Nor did the Court rely on the unstated "limiting principle" of reasonableness that our dissenting colleague has discerned from *Baker*. Dissenting Op. at 27.

If we treated every factual distinction with a precedential decision as necessarily material, the doctrine of precedent would lose most of its function. Glanville L. Williams, *Learning the Law* 93 (A.T.H. Smith ed., 14th ed. 2010) ("We know that in the flux of life all the facts of a case will never recur; but the legally material facts

may recur and it is with these that the doctrine [of precedent] is concerned."). Judges would be freed from the requirement that they apply the law, so long as they could unearth any factual discrepancy between binding caselaw and the case they wanted to decide a different way. Bryan A. Garner, *et al.*, *The Law of Judicial Precedent* § 7, at 92 (2016) ("For one decision to be precedent for another, the facts in the two cases need not be identical. But they must be substantially similar, without material difference."). So, where the two conditions identified by the Supreme Court in *Baker* are met, we give no weight to facts beyond those material to the two conditions.

And even if *Baker* had introduced a fact-intensive, totality-of-the-circumstances analysis for over-detention claims, the circumstances of Sosa's detention would still convince us that he has no such claim. None of the facts differentiating *Baker* from this case are material. For instance, Linnie was held over the New Year's holiday, *id.* at 141, and Sosa was held over a non-holiday weekend. But detainees have the same due-process rights on holidays as they do every other day of the year, so the incidence of a holiday does not change our constitutional analysis. Nor is the lower technological standard for police investigations in 1972, in contrast to 2018, a material distinction. It was permissible for the police to hold Linnie for three days, not because computers were unavailable back then, but because "a detention of three days" is objectively shorter than the duration that might give rise to an unlawful deprivation of liberty without due process. 443 U.S. at 143–45. Indeed, the

identification in *Baker* required only a low-technology photograph comparison, so *Baker* did not depend, even implicitly, on a technological standard. And it does not matter that the warrant in this case was comparatively older than the *Baker* warrant or that it listed a comparatively more common name. "Absent an attack on the *validity* of the warrant under which [a detainee] was arrested," *id.* at 144 (emphasis added), we make no inquiry into the warrant. After distinctions immaterial to the *Baker* Court's holding are set aside, the facts of *Baker* and this case are strikingly similar. So, our holding is the same too.

Sosa and the dissent argue that our precedent in *Cannon* supports Sosa's over-detention claim. *See* Dissenting Op. at 13–16. In *Cannon*, officers questioned a traveler named Mary Parrott at a highway rest stop in Alabama, learned that a Mary Parrott was wanted in Kentucky for theft, arrested the traveler, filled out an arrest report with the information of the wanted Mary Parrott instead of the traveler, and used that arrest report purportedly to support detaining the Alabama traveler for seven days and sending her to Kentucky, despite her accurate insistence that she had been misidentified. *Id.* at 1560–61. We held that a jury could have found that the arresting officer had violated the woman's constitutional rights. *Id.* at 1565. Specifically, the officer erred by keeping her detained "after it was or should have been known that [she] was entitled to release." *Id.* at 1563. Sosa and the dissent contend that, under *Cannon*, he was entitled to release because the deputies who detained

him knew he may have been misidentified based on his protests and did not verify his identity.

Sosa and the dissent misread *Cannon*: we could decide *Cannon* as we did because the two conditions required for *Baker*'s holding were not met. First, it is not evident that the *Cannon* detainee was arrested on a valid warrant supported by probable cause. The officer who wrote the report that the county judge used as the basis for the arrest warrant did not record the information for the woman the officer sought to arrest. Instead, he copied from a computer database the personal information of the woman wanted in Kentucky—plus, a social security number that belonged to a third person, an unrelated fugitive also in the database. *Id.* at 1560–61; *see Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (asserting that probable cause exists where a prudent person would believe, based on "trustworthy information," that "the suspect has committed" an offense) (internal quotation marks omitted). We explained that the plaintiff had "essentially a claim of false imprisonment rising to the level of a liberty deprivation." *Cannon*, 1 F.3d at 1562; *cf. Luke v. Gulley*, 50 F.4th 90, 95 (11th Cir. 2022) (stating that a detainee's right to be free from process-based seizure is violated where "the legal process justifying his seizure was constitutionally infirm" and "his seizure would not otherwise be justified . . .") (internal quotation marks omitted). Second, the *Cannon* detainee was held for seven days, a period more than twice greater than the duration sheltered from liability in *Baker*. *Cannon*, 1 F.3d

at 1561. In short, the *Cannon* detention satisfied neither of the two *Baker* conditions for lawful detentions.

*Baker* controls this case. Unlike the *Cannon* detainee, Sosa was arrested on a valid warrant and held for only three days. So, under *Baker*, Sosa's complaint did not state a claim for a violation of his due-process rights.

## IV. CONCLUSION

We **AFFIRM** the dismissal of Sosa's claim that his detention violated the Fourteenth Amendment, and we **REMAND** all remaining issues to the panel.

JORDAN, Circuit Judge, joined by WILSON and JILL PRYOR, Circuit Judges, concurring in the judgment:

For the reasons set out by Judge Rosenbaum in Part II.A of her dissent, I do not think that *Baker v. McCollan*, 443 U.S. 137, 143–46 (1979), forecloses a substantive due process claim for "overdetention" based on misidentification. In my opinion, we correctly recognized such a claim in *Cannon v. Macon Cty.*, 1 F.3d 1558 (11th Cir. 1993), *as modified on rehearing*, 15 F.3d 1022 (11th Cir. 1994), and *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996). And so have a number of our sister circuits. *See generally* 1 Sheldon H. Nahmood, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 § 3:57 (Sept. 2022 update) (citing cases). As we explained in *Reeves v. City of Jackson*, 608 F.2d 644 (5th Cir. 1979), the Supreme Court in *Baker* said that detention "pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'" *Id.* at 651 (quoting *Baker*, 443 U.S. at 145) (internal quotation marks omitted).

I nevertheless concur in the judgment affirming dismissal of Mr. Sosa's "overdetention" claim. The Supreme Court's recent qualified immunity decisions require that the facts of prior cases be very, very close to the ones at hand to give officers reasonable notice of what is prohibited. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–9 (2021); *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021). Although the inquiry does not—at least not yet—demand "a case directly on point," it requires that "existing precedent . . .

place[ ] the statutory or constitutional question beyond debate." *Rivas-Villegas*, 142 S. Ct. at 8. If the only relevant case here was *Cannon*, then maybe a reasonable police officer would know that Mr. Sosa's continued detention was unlawful. But reading *Cannon* in conjunction with *Baker*, as we must, makes the issue less clear. Mr. Sosa was detained for three days, the same time period at issue in *Baker*, while *Cannon* involved a detention of seven days. Those two cases, taken together, would not have provided reasonable officers adequate notice that they were violating Mr. Sosa's substantive due process rights by not releasing him—at least not "beyond debate" as the Supreme Court's decisions require. *See Rivas-Villegas*, 142 S. Ct. at 8; *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *White v. Pauly*, 580 U.S. 73, 79 (2017). In other words, under the legal fiction created by qualified immunity, a reasonable police officer who read these cases would not know for certain that detaining Mr. Sosa for three days was unlawful. *Cf. City of Tahlequah*, 142 S. Ct. at 12 ("Suffice it to say, a reasonable officer could miss the connection between that case and this one.").

My concurrence is a reluctant one because the Supreme Court's governing (and judicially-created) qualified immunity jurisprudence is far removed from the principles existing in the early 1870s, when Congress enacted what is now 42 U.S.C. § 1983. *See, e.g., Zigler v. Abassi*, 137 S. Ct. 1843, 1870–72 (2017) (Thomas, J., concurring in part and concurring in the judgment); William Baude, *Is Qualified Immunity Unlawful*, 106 Cal. L. Rev. 45, 55-61 (2018); Ilan Wurman, *Qualified Immunity and Statutory*

*Interpretation*, 37 Seattle U. L. Rev. 939, 961–72 (2014); Akhil Reed Amar, The Constitution and Criminal Procedure 40–42 (1997).  If federal statutes are supposed to be interpreted according to ordinary public meaning and understanding at the time of enactment, *see, e.g., Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018), and if § 1983 preserved common-law immunities existing at the time of its enactment, *see Pierson v. Ray*, 386 U.S. 547, 554–55 (1967), the qualified immunity doctrine we have today is regrettable.  Hopefully one day soon the Supreme Court will see fit to correct it.

NEWSOM, Circuit Judge, joined by WILLIAM PRYOR, Chief Judge, and LAGOA, Circuit Judge, concurring:

On April 20, 2018, David Sosa must have felt like he had been dropped into a Kafka novel, for "without having done anything truly wrong, he was arrested." Franz Kafka, *The Trial* 3 (Breon Mitchell, trans., 1998). Worse than that, following a routine traffic stop, Sosa was arrested and detained by his hometown sheriff's deputies for the *second* time on the *same* decades-old drug-dealing warrant issued for *another* David Sosa—one who lived hundreds of miles away in a different state, was a different age, height, and weight, and had conspicuously different tattoo markings. Just as he had the first go round, our Sosa naturally (and repeatedly) told the arresting officers that they had the wrong guy—but to no avail. The deputies detained Sosa for three days over a weekend before they eventually got around to fingerprinting him, recognized their mistake, and released him.

What happened to Sosa was, in a word, awful. Without prejudging the issue, I'd be willing to assume that the officers' conduct—jailing Sosa for three full days on a warrant issued for someone else, despite his repeated pleas of innocence and without bothering to do much of anything to verify his identity—might even have been tortious. The question before the Court today, though, is whether their conduct violated the United States Constitution—in particular, whether it infringed Sosa's so-called "substantive due process" rights. The majority quite correctly concludes that it didn't. As its opinion straightforwardly explains, the Supreme

Court's decision in *Baker v. McCollan*, 443 U.S. 137 (1979), which rejected a due-process challenge to a materially identical "overdetention," is essentially on point, and our later decision in *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993), which recognized a substantive-due-process claim based on a detention more than twice as long as Sosa's, is eminently distinguishable.  *See* Maj. Op. at 8–12.  It really is as simple as that.

I therefore concur in the Court's decision and join its opinion in full.  I write separately to reiterate (once again) my grave reservations about the role that "substantive due process" has come to play in constitutional decisionmaking.

## I

Substantive due process is a slippery, shape-shifting doctrine.  It can take on any of a number of different forms.  In what is, I suppose, its most conventional instantiation, it's the method by which the Supreme Court has gradually "incorporated" most of the substantive protections of the Bill of Rights against the states through the Fourteenth Amendment's Due Process Clause.  *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 759–80 (2010) (holding that the Due Process Clause incorporates the Second Amendment right to keep and bear arms).  Some observers—including me—have criticized the Court's reliance on substantive due process even for that limited purpose and have urged it to refocus its attention on the long-lost Privileges or Immunities Clause.  *See id.* at 805–50 (Thomas, J., concurring in part and concurring in the judgment); Kevin Newsom, *Setting Incorporationism Straight:*

*A Reinterpretation of the* Slaughter-House Cases, 109 Yale L.J. 643, 658–87 (2000).

More controversially, substantive due process has been deployed as a means of protecting certain unenumerated interests—like, say, "the sanctity of the family"—that are deemed to be "deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977), or, even more obscurely, "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). *Cf. Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (recognizing a limited role for the Due Process Clause in "guarantee[ing] some rights that are not mentioned in the Constitution"). As I've explained elsewhere, resort to these sorts of "vague shibboleths" is hardly a recipe for principled decisionmaking. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1128 (11th Cir. 2021) (Newsom, J., concurring).

Still further afield, substantive due process has (too) often been invoked as a failsafe doctrine of sorts—a way to plug some perceived gap in the written Constitution and thereby rectify some alleged unfairness that the document's terms, for one reason or another, just don't address. "Surely," the thinking goes, "the Constitution doesn't permit _____!" A court is confronted with some injustice—say, for instance, an individual's three-day detention in the face of his repeated protestations of innocence and his jailers' refusal to make any real effort to verify basic facts—and is told that the Constitution simply *must* provide a remedy. And because the

court can't find another avenue by which to right the alleged wrong, it defaults to substantive due process.

## II

I'm a confessed (and longtime) skeptic of substantive due process—in all its various forms. *See, e.g.*, *id.* at 1126–29; *Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1304–07 (11th Cir. 2019) (Newsom, J., concurring in the judgment); *see also* Newsom, *Incorporationism*, at 733–42. Why? What's so bad about it? Well, a lot.

First, and most obviously—and most seriously from my perspective—substantive due process has no footing in constitutional text. Quite the contrary, in fact, it makes a hash of the provision from which it purportedly emanates. The Fourteenth Amendment's Due Process Clause states, simply, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Two notes about that language: One, as Dean Ely observed, "there is simply no avoiding the fact that the word that follows 'due' is 'process.'" John Hart Ely, *Democracy and Distrust* 18 (1980). And two, as Professor Tribe has explained, "the expressly conditional, purely procedural cast of the Due Process Clause . . . leaves no doubt that life, liberty, and property may all be extinguished, providing only that the government do so *with* 'due process of law.'" Laurence H. Tribe, 1 *American Constitutional Law* 1320 (3d ed. 2000). In light of the linguistic misfit, Ely famously dubbed substantive due process a "contradiction in terms—sort of like 'green pastel redness.'" Ely,

*Democracy and Distrust*, at 18.  If the Constitution's text matters at all, Ely's quip captures what seems to me to be an intractable problem:  The Due Process Clause's plain language renders it positively incapable of absolutely protecting substantive rights.

Second, "there's the matter of history."  *Hillcrest*, 915 F.3d at 1305 (Newsom, J., concurring in the judgment).  "The best indications," as I've explained by reference to verifiable historical sources, "are that those who framed the Fourteenth Amendment's Due Process Clause envisioned it as a guarantee (as its phrasing and moniker indicate) of fair process, not a font of substantive rights." *Id*.; *accord, e.g.*, Newsom, *Incorporationism*, at 739–40.  I won't belabor the point here, except to say that people smarter and more steeped in the history than I am share my assessment.  *See, e.g.*, Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 173 (1998) (making the same point, by reference to many of the same sources).

Third, substantive due process has, let's just say, a checkered past.  "At least in the Supreme Court, substantive-due-process doctrine traces its roots to the fateful—and repugnant—decision" in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), in which the Court somehow teased out of the terms of the Fifth Amendment's Due Process Clause a "white man's 'right' to own a black man." *Hillcrest*, 915 F.3d at 1305 (Newsom, J., concurring in the judgment); *see also* Tribe, *American Constitutional Law*, at 1334 (describing *Dred Scott*, which "embraced a substantive reading of the due process requirement," as "more nightmare than precedent in

1866"). And things didn't get much better from there, as substantive due process provided the quicksand on which the Court later built the oft-criticized—and since-overruled—decisions in *Lochner v. New York*, 198 U.S. 45 (1905), and *Roe v. Wade*, 410 U.S. 113 (1973). *See* Newsom, *Incorporationism*, at 740–42 (tracing substantive due process's doctrinal pedigree). Notably, even defenders of those decisions—including *Roe*—have confessed a sense of dread (or embarrassment, or both) that they share a doctrinal foundation with *Dred Scott*. *See, e.g.*, Tribe, *American Constitutional Law*, at 1318.

Finally, on top of the textual, historical, and ancestral difficulties, substantive due process's freewheelingness (witness the dissent's "six facts," *see* Dissenting Op. at 33–40) poses a serious practical problem. As Justice Stevens explained for a unanimous Supreme Court in *Collins v. City of Harker Heights*, the "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." 503 U.S. 115, 125 (1992). Accordingly, he emphasized, "[t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever we are asked to break new ground" wielding a substantive-due-process shovel. *Id.* As I've summarized the Supreme Court's concern, "there is always a risk that a court asked to recognize a substantive-due-process violation—but without traditional interpretive guardrails—will simply read into the Constitution its own view of good government." *Hillcrest*, 915 F.3d at 1306 (Newsom, J., concurring in the judgment). Even more grimly, Professor Tribe has warned that

"[t]here is a very real threat that that the doctrinal shakiness of substantive due process may . . . undermine public confidence in the institution of judicial review and in the ability of judges honestly to interpret the dictates of the Constitution." Tribe, *American Constitutional Law*, at 1317.

Long story short: Substantive due process is a doctrine shot through with problems and chock full of risks.

### III

I'd be game for ditching substantive due process altogether and exploring what I think to be more promising—and principled—vehicles for protecting individual rights against state interference. *See* Newsom, *Incorporationism*, at 658–87. Short of that, though, what can be done to avert the harm that the doctrine threatens? The Supreme Court has emphasized one important means of cabining substantive due process—one that, as the dissent seems to recognize, has direct application here. *See* Dissenting Op. at 48 n.18. Reviewing courts, it has said, should be particularly reluctant to indulge substantive-due-process arguments when an *actual* constitutional provision addresses the sort of injury that a complainant alleges. So, for instance, the Court has held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality op.) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Accordingly, the Court has stressed, "if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

That, it seems to me, is pretty much exactly where we find ourselves today.  Sosa complains, in essence—and not without some justification—that he was arrested for a crime that he didn't commit and was then detained in jail for an unfairly long time.  As it turns out, the Constitution addresses those types of complaints.  The Fourth Amendment, of course, generally prohibits "unreasonable . . . seizures" and, more specifically, requires that warrants be issued only on a showing of "probable cause."  U.S. Const. amend. IV.  And the Sixth Amendment guarantees every "accused" the "right to a speedy . . . trial."  *Id.* amend. VI.  It's even possible that a complaint like Sosa's could, in extreme circumstances, implicate the Eighth Amendment, which prohibits "excessive bail."  *Id.* amend. VIII.

Now, to be sure, as matters currently stand, none of those express textual guarantees provides Sosa a ready remedy.  As far as the Fourth Amendment is concerned, Sosa's arrest pursuant to a valid warrant would appear to end the inquiry.  The Supreme Court has held that those arrested *without* a warrant must be given a probable-cause hearing before a neutral magistrate, usually within 48 hours, *see County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), but no similar temporal protection applies to those,

like Sosa, who were initially arrested pursuant to a magistrate-issued warrant. The Sixth Amendment would have prohibited Sosa's "indefinite[]" detention, *see Baker*, 443 U.S. at 144, but the Speedy Trial Clause wouldn't itself have imposed any hard outer limit, *see Barker v. Wingo*, 407 U.S. 514, 530 (1972) (prescribing an "ad hoc" "balancing test"). And the Eighth Amendment, while perhaps in the general ballpark, likewise wouldn't have offered Sosa any relief. Although the Supreme Court seems to have been willing to assume that states "are required by the United States Constitution to release an accused criminal defendant on bail" in appropriate circumstances, *Baker*, 443 U.S. at 144 n.3, that right almost certainly wouldn't have attached unless and until Sosa was formally charged, *cf. Carlson v. Landon*, 342 U.S. 524, 545 (1952) ("The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country."); 18 U.S.C. § 3142 (providing bail for a "person charged with an offense").[1]

　　But—and this is important—from the premise that the Fourth, Sixth, and Eighth Amendments don't provide Sosa any relief, it does *not* follow that "substantive due process" must do so. To the contrary, the fact that the Constitution expressly addresses specific, discrete issues that arise in criminal investigations and

---

[1] *Cf. also Schultz v. Alabama*, 42 F.4th 1298, 1323–25 (11th Cir. 2022) (upholding the constitutionality of a money-bail regime against a constitutional challenge and collecting additional precedents doing likewise).

prosecutions is a sufficient reason not to contort the open-textured Due Process Clause to force it to reach other adjacent (but unaddressed) matters.  In explaining that substantive due process has no role to play when a party's claim is "covered" by a specific constitutional provision, *Lanier*, 520 U.S. at 272 n.7, the Supreme Court can't have meant that the doctrine takes a back seat *only* when that provision provides a sure-fire winner; that understanding would render the Court's prudent limitation on substantive-due-process decisionmaking wholly superfluous.  Rather, as I've explained elsewhere, "[i]f (for whatever reason) the claim can't proceed in its natural textual and doctrinal 'home,' then, well, it can't proceed"—the claimant "can't just repackage it in substantive-due-process garb and attempt to relitigate it." *Hillcrest*, 915 F.3d at 1306 (Newsom, J., concurring in the judgment).

So, to be clear, while substantive due process is bad on its best day, this case represents the doctrine at "its abject worst." *Id.* at 1306.  We're not *just* being asked to twist the Due Process Clause's plain meaning to incorporate some specific substantive freedom enshrined in the Bill of Rights.  And we're not even *just* being asked to plumb the depths of "history," "tradition," and "ordered liberty" to identify and protect some favored unenumerated right.  Here, rather, we're being asked to use substantive due process as a constitutional gap-filler—to hold, in essence, that because what happened to David Sosa was unfair, it *must* violate the

Constitution.    That, in short, is "not how constitutional law works." *Id.* at 1304.[2]

## IV

I'll end where I began:  What happened to David Sosa was awful.  But as I've said before, "[n]ot everything that s[tink]s violates the Constitution."  *Hillcrest*, 915 F.3d at 1303 (Newsom, J., concurring in the judgment).  As soon as courts come to believe that the Constitution must—simply *must*—right every societal wrong and cure every societal ill, they put themselves at grave risk of making it up as they go along, penciling in their reasoning in reverse to justify their preferred outcomes.  "And if there is any fixed star in my own constitutional constellation, it's that unelected, unaccountable federal judges shouldn't make stuff up." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1261 (11th Cir. 2022) (Newsom, J., concurring) (citing *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

---

[2] From everything I've said here, I suppose this goes without saying, but I'll say it anyway:  I think that *Cannon v. Macon County*, 1 F.3d 1558—in which a panel of this Court recognized a substantive-due-process claim for an alleged "overdetention"—was wrongly decided.  Today isn't the day, I suppose, but if and when the issue is squarely presented, I would vote to overrule it.

ROSENBAUM, Circuit Judge, Dissenting:

Everyone agrees that David Sosa is an innocent man. Yet police officers arrested and detained him in jail on a warrant for another man. He was not allowed to leave that day. Or the next. Or the one after that. In all, Sosa spent three nights and days confined to a jail cell. Sosa remained in jail for roughly 72 hours because, despite good reason to believe they had arrested the wrong man, Martin County Sheriff's officials refused to confirm Sosa's identity—a process that requires an officer to perform less than a minute of work.

Faced with this sequence of events, my colleagues in the Majority wring their hands and say too bad for Sosa but insist the Constitution allows it. Even worse, three of my colleagues claim that the Constitution permits officials to hold people in Sosa's position without *ever* verifying their identity. *See* Newsom Op. at 8–11. According to these judges, no constitutional violation occurs until the detained person's *speedy-trial* rights are violated—that is, about *a year or more later. See id.* at 8–9 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).[1] A year in jail! And for no reason other than

---

[1] *See also United States v. Knight*, 562 F.3d 1314, 1323 (11th Cir. 2009) (W. Pryor, J.) (stating that a speedy-trial delay cannot violate the Sixth Amendment if it is not "presumptively prejudicial," which cannot happen until the delay "approaches one year," but holding that the two-year delay of the defendant's trial there did not violate the Sixth Amendment right to a speedy trial).

that law-enforcement officials refused to engage in less than a minute of work to confirm their prisoner's identity.

This misguided view of the Constitution is horrifying. It's also wrong. Our precedent shows that the Constitution does not have an aircraft-carrier-sized loophole in its guarantee that no person shall be deprived of their liberty without due process of law. The Majority Opinion unceremoniously casts our precedent aside. But when an officer suspects he has detained the wrong person and has the means to quickly and easily verify the prisoner's identity, the Constitution does not allow the officer to sit on his hands while the detainee spends days, weeks, or months in jail.

Indeed, over the last thirty years, we have repeatedly recognized that the Constitution protects the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993).[2] And under this principle, an officer's

---

[2] *See, e.g., Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996) ("In light of the sparse information Christian had when he made the arrest, Christian knew or should have known that the imprisonment of Ortega may have constituted an unlawful imprisonment under section 1983 in violation of the Fourteenth Amendment."); *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009) ("The Fourteenth Amendment Due Process Clause includes the 'right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'") (quoting *Cannon*, 1 F.3d at 1563); *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009) (W. Pryor, J.) (acknowledging that, under our precedent, "'under certain circumstances, a detention following a valid arrest may present a viable section 1983 claim where the detainee protests the detention on the basis of misidentification'") (quoting *Ortega*, 85

"failure to take any steps to identify [the arrested person] as the wanted fugitive [is] sufficient to raise a question of fact as to [the officer's] deliberate indifference toward the plaintiff's due process rights." *Id.* at 1564.

Here, jail officials had good reason to know that the David Sosa in custody—the plaintiff here—was not the alleged-crack-cocaine-trafficker David Sosa from Texas (the "wanted Sosa"). For one, the warrant was more than a quarter-of-a-century old, from halfway across the country, and Sosa—who worked in research and development of airplane engines for Pratt and Whitney and its affiliates—matched almost none of the descriptors for the wanted Sosa (like height, weight, or tattoos). For another, Sosa repeatedly told his jailers that he did not match the identifiers for the wanted Sosa and that the same sheriff's office had wrongly arrested him on the very same warrant just a few years earlier. And third, Sosa is one of *thousands* of individuals who share the name "David Sosa" and lived in or visited the United States when Sosa's 2018 arrest and detention occurred. In other words, the deputies had a better shot at winning money in Florida Lottery games than they did of having

---

F.3d at 1527); *May v. City of Nahunta*, 846 F.3d 1320, 1329 (11th Cir. 2017) (noting that a plaintiff can make out a claim for violation of her Fourteenth Amendment due-process rights by "prov[ing] that the defendant acted with deliberate indifference in violating the plaintiff's right to be free from continued detention after the defendant knew or should have known that the detained was entitled to release").

4                    ROSENBAUM, J., Dissenting                    20-12781

the wanted Sosa in custody.[3]  Pair those odds with the descriptive differences between Sosa and the wanted Sosa and account for Sosa's repeated statements that he had wrongly been arrested on the same warrant just a few years earlier, and it's almost like the jail deputies knowingly bought losing lottery tickets.  These facts should have set off alarm bells in the Martin County jail officials' heads that they needed to make sure they had the right David Sosa.  But instead, the jailers did nothing for three nights and days.

Sosa's jailers could not ignore these flashing neon signs that they likely had the wrong Sosa and remain deliberately indifferent to Sosa's identity for three nights and days.  Rather, the Constitution required them to take reasonable action—like the simple and quick computerized process of running Sosa's fingerprints against the fingerprints of the wanted Sosa—to confirm whether Sosa was the wanted Sosa.  Our precedent establishes that when the officers failed to do even that, they violated Sosa's constitutional rights.  *See Cannon*, 1 F.3d at 1563.

---

[3] *See, e.g.*, Florida Lottery Game #5048 – Florida 300X THE CASH, with a 1-in-500 chance of winning $1,000.00; Florida Lottery Game #1485 – BILLION DOLLAR GOLD RUSH SUPREME, with a 1-in-821 chance of winning $1,000; Florida Lottery Game #5029 – 500X THE CASH, with a 1-in-1,000 chance of winning $1,000.00; Florida Lottery Game # 1454 - $500 MADNESS, with a 1-in-136 chance of winning $500.00.  *Scratch-offs*, FLORIDA LOTTERY, https://www.flalottery.com/scratch-offs (last visited Jan. 19, 2023).

The Majority Opinion relies on *Baker v. McCollan* to excuse its failure to apply *Cannon* (and its progeny) to recognize the violation of Sosa's constitutional rights.  Maj. Op. at 8 (citing 443 U.S. 137, 144 (1979)).  But *Baker* does not justify the Majority's result.  To the contrary, *Baker* supports the opposite answer—that Sosa sufficiently alleged that Sanchez and the other jail officers who did nothing for three nights and days to confirm Sosa's identity while Sosa sat in jail violated Sosa's constitutional rights.  So I would conclude that Sosa has sufficiently alleged a claim, and Sanchez and the other jail officers are not entitled to qualified immunity at this time.  I therefore respectfully dissent.

I organize my dissent in three sections.  Section I sets forth the relevant background here.  In Section II, I show why *Cannon* and *Baker* require the conclusion that Sanchez and the other jail deputies are not entitled to qualified immunity, and their motion to dismiss should have been denied.  And Section III explains why, if we were writing on a clean slate, the Fourth Amendment more appropriately serves as the source of the right to be free from continued detention when it was known or should have been known that the person was entitled to release.

6                    ROSENBAUM, J., Dissenting                    20-12781

## I.    Background

Sosa has lived in Martin County, Florida, since 2014.[4] Things did not start well for him there.  In November of that year, a Martin County Sheriff's deputy pulled Sosa over for a routine traffic stop.  During the encounter, the deputy ran Sosa's name through the Office's computer system.

The computer told the deputy of an outstanding 1992 warrant issued out of Harris County, Texas, for a "David Sosa" in connection with the wanted Sosa's conviction for selling crack cocaine. The warrant described the wanted Sosa, including his date of birth, height, weight, tattoo information (he had at least one), and other details.  When the deputy went to arrest Sosa on the warrant, Sosa pointed out that his own date of birth, height, and weight did not match the information for the wanted Sosa and that, unlike the wanted Sosa, he had no tattoos.  The deputies arrested Sosa, anyway, and took him to the station.

While detained at the station, Sosa told two Martin County jailers that he was not the wanted Sosa.  And he explained that the wanted Sosa's identifiers differed from his own.  Then a deputy fingerprinted Sosa and determined that he was not the wanted Sosa.

---

[4] Because this case comes to us on a motion to dismiss, we accept all well-pleaded facts in the complaint as true.  *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).

So roughly three hours after Sosa was initially detained, he was released.

Three-and-a-half years passed. Then, the same thing happened again—only this time, Sosa was not lucky enough to be released within three hours. On April 20, 2018, a different deputy of the Martin County Sheriff's Department, Deputy Killough, pulled Sosa over for a traffic stop. When Deputy Killough ran Sosa's name, he discovered the same 1992 open warrant. Sosa explained that he was not the wanted Sosa and told Deputy Killough he had previously been incorrectly arrested on that warrant and released when deputies realized the error. Sosa again noted that he and the wanted Sosa did not share the same birthdate, Social Security number, tattooed status, or other identifying information. But once again, his explanation did not work; Deputy Killough arrested Sosa and impounded his truck anyway.

When Deputy Killough took Sosa to the Martin County jail, Sosa "repeatedly explained to many Martin County employees . . . that his date of birth and other identifying information [were] different than the information on the warrant for the wanted . . . Sosa." Among those Martin County employees were Deputy Sanchez and the other Martin County deputies in the booking area. They wrote down Sosa's information and told him they would follow up on the matter.

But Sosa spent the remainder of April 20 in jail.

The next day, Sosa appeared by video before a magistrate judge.  Though Sosa tried to explain the mistaken identity, "several Martin County jailers threatened him and told him not to talk to the judge during his hearing."  As a result, Sosa "thought it was a crime to talk to the judge."

Sosa spent the rest of that day in jail.

And then he spent the next day in jail as well.

Finally, after detaining Sosa for three nights, deputies finger-printed him on April 23 and released him in the late afternoon.  In the meantime, Sosa missed work and had to pay to retrieve his truck from impoundment.

## II.    Under our binding precedent, Sosa alleged sufficient facts to survive the Martin County jailers' motion to dismiss based on qualified immunity.

Qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation and citation omitted).  But it does not extend to an officer who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]."  *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal quotation marks and citation omitted) (alteration in original).

To receive qualified immunity, a public official must first establish that he was acting within the scope of his discretionary authority when the challenged action occurred. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). When we speak of "discretionary authority," we mean all actions the official took (1) in performing his duties and (2) in the scope of his authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). Deputy Sanchez and the other deputies at the jail satisfied this requirement, as they detained Sosa while performing their official duties.

Because the deputies were acting within the scope of their discretionary authority, the burden shifts to Sosa to show that qualified immunity is inappropriate. *See id.* To do that, the factual allegations in Sosa's complaint must establish two things: (1) the deputies violated his constitutional rights by detaining him for three nights and days on a warrant for a different David Sosa when the deputies knew or should have known that he was not the wanted Sosa; and (2) those rights were "clearly established," in that "every reasonable official would have understood that what he [wa]s doing violate[d] that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up).

As I explain below, Sosa's complaint does both.

A. *Sosa sufficiently alleged that deputies violated his constitutional rights by continuing to detain him when they knew or should have known that he was entitled to release.*

Sosa's complaint alleged sufficient facts to establish that the Martin County jail deputies violated his constitutional rights by continuing to detain him when they knew or should have known that he was entitled to release. That is so for two reasons. First, our holding in *Cannon* requires the conclusion that Sosa stated a claim for violation of his constitutional rights. And second, the Supreme Court's decision in *Baker* independently supports the same outcome.

1. <u>*Cannon* and its progeny require the conclusion that Sosa sufficiently alleged that jail deputies violated his constitutional right to be free from continued detention when it was or should have been known that he was entitled to release.</u>

Though a warrant can support an arrest, we have long recognized that, "under certain circumstances, a detention following a valid arrest may present a viable section 1983 claim where the detainee protests the detention on the basis of misidentification." *Case*, 555 F.3d at 1330 (W. Pryor, J.) (quoting *Ortega*, 85 F.3d at 1527). As we've explained, "after the lapse of a certain amount of time, continued detention in the face of repeated protests [of misidentification that turn out to be true and are ignored] will deprive the accused of liberty without due process." *Cannon*, 1 F.3d at 1562. This is so, we've said, because substantive due process

protects the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id.* at 1563. A state official violates that right when he shows "deliberate indifference" to the plaintiff's right to be free from unwarranted continued detention. *Id.*

And we are not alone in concluding that the Constitution protects detainees against continued detention once it is or should be known that the detainee is entitled to release. At least four of our sister circuits agree. *See, e.g., Gray v. Cuyahoga Cnty. Sheriff's Dep't*, 150 F.3d 579 (6th Cir. 1998), *amended by* 160 F.3d 276, 276 (6th Cir. 1998) ("[T]he trier of fact could find that the failure by [the jailers] to ascertain that they were holding the wrong person violated Gray's due-process rights under the Fourteenth Amendment. . . . On remand, . . . the principal question for the trier of fact will be whether [the defendant jailers] acted with something akin to deliberate indifference in failing to ascertain that the Dwayne Gray they had in custody was not the person wanted by the Michigan authorities on the outstanding parole-violation warrants.");[5] *Garcia v. Cnty. of Riverside*, 817 F.3d 635, 639–43 (9th Cir. 2016) ("[A]n obvious physical discrepancy between a warrant subject and a

---

[5] *See also Seales v. City of Detroit*, 959 F.3d 235, 241 (6th Cir. 2020) ("By our lights, Seales sued the wrong person. Officer Zberkot merely helped to arrest Seales and initiated the booking procedures, all legitimately under the Fourth Amendment. He wasn't Seales' jailer. . . . Seales offers no explanation why Zberkot, as opposed to the jailers, bears responsibility for the fifteen-day detention.").

booked individual, such as a nine-inch difference in height, accompanied by a detainee's complaints of misidentification, should prompt officers to engage in readily available and resource-efficient identity checks, such as a fingerprint comparison, to ensure that they are not detaining the wrong person."); *Russo v. City of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007) (concluding that plaintiff sufficiently alleged a constitutional violation based on his lengthy detention, given "(1) the length of time of [his] wrongful incarceration, (2) the ease with which the evidence exculpating [him]—which was in the officers' possession—could have been checked, and (3) the alleged intentionality of [the defendants'] behavior"); *Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011) (noting in the context of a material witness's § 1983 suit for unreasonable seizure that "numerous courts have reached the almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement 'after it was or should have been known that the detainee was entitled to release'") (quoting *Cannon*, 1 F.3d at 1563).[6]

_____

[6] Like we concluded in *Cannon*, the Sixth Circuit determined that the right finds its home in Fourteenth Amendment substantive due process. *See Gray*, 160 F.3d at 276. Other circuits have held that different provisions of the Constitution protect the right. The Ninth Circuit, for instance, has relied on the Fourteenth Amendment's guarantee of procedural due process, *Garcia*, 817 F.3d at 640, and the Second Circuit, which once agreed that the right is one of substantive due process under the Fourteenth Amendment, currently views the right as grounded in the Fourth Amendment's protection against unreasonable seizures, *Russo*, 479 F.3d at 208–09. So does the Third Circuit.

As *Cannon* demonstrates, state officials violate this right by displaying deliberate indifference to the likelihood that a detainee's identity does not match that of the suspect. In *Cannon*, a deputy encountered the plaintiff—then known as Mary Rene Parrott—at a rest stop in Georgia. *Id.* at 1560. When he ran her name through the National Crime Information Center database ("NCIC"), he learned that Kentucky wanted a Mary E. Mann, also known as Mary E. Parrott, for crimes. *Id.* So he validly arrested Parrott and took her to jail. *Id.* At the jail, the arresting deputy handed Parrott off to the jailer, Deputy Collins, who completed Parrott's arrest report. *Id.* Parrott repeatedly protested that she was not Mann. *Id.* Still, the officer stated that he identified Parrott as Mann because

---

*Schneyder*, 653 F.3d at 330. Regardless, though, as the Second Circuit has explained, some disagreement over the source of the right "is of no consequence" to whether the right exists. *See Russo*, 479 F.3d at 212 (quoting *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000), for the proposition that "there is no question that plaintiff's right to be free from excessive force was clearly established, even if there is some ongoing uncertainty about which constitutional text is the source of that right." (cleaned up), and citing *Alexander v. Perrill*, 916 F.2d 1392, 1398 n.11 (9th Cir. 1990), as "noting that the only issue before it with respect to qualified immunity was 'whether there was a clearly established duty to investigate'; that its prior decision in *Haygood v. Younger,* 769 F.2d 1350 (9th Cir. 1985) (en banc), 'answer[ed] that question in the affirmative'; and that '[f]or purposes of this appeal, it is unimportant that the *Haygood* court found the prison officials ultimately violated the plaintiff's right to be free from cruel and unusual punishment, rather than the right to due process and to be free from double jeopardy as alleged in this case'").

the two had matching Social Security numbers and birth dates; and because Mann used the alias Mary E. Parrott.  *Id.*

As it turned out, though, Deputy Collins failed to take any steps to identify Parrott as the wanted Mann.  Parrott and Mann did not share matching Social Security numbers or birth dates.  *Id.* They had different colored eyes.  *Id.*  And they were different heights.  *Id.*  Parrott was also twelve years younger than Mann.  *Id.* Yet despite these distinctions, Parrot's arrest report reflected Mann's identification information.  *Id.*  Deputy Collins initially testified that he had filled out the arrest report with information he had obtained directly from Parrott.  *Id.*  But the information in the arrest report matched the information in the NCIC report (except that the Social Security number matched the Social Security number of another individual listed on the NCIC report for Mann).  *Id.* This mismatch, we said, suggested that Deputy Collins hadn't gotten the information from Parrott at all; he had simply "copied it directly from the NCIC report."  *Id.*  Deputy Collins also attested to a local judge that he believed Parrott to be the wanted Mann, so the judge issued a fugitive warrant for Parrott's arrest.  *Id.* at 1561. Ultimately, Parrott spent a total of seven days in the Georgia jail before she was transferred to Kentucky, where authorities promptly released her when they discovered that she was not Mann.  *Id.*

When we considered Parrott's case, we explained that "Collins' failure to take any steps to identify [Parrott] as the wanted

fugitive was sufficient to raise a question of fact as to his deliberate indifference toward [Parrott's] due process rights." *Id.* at 1564. In reaching this conclusion, we recognized that *Baker* did not "preclude all § 1983 claims based on false imprisonment." *Id.* at 1562. To be sure, we acknowledged that "those responsible for maintaining custody of detainees are not constitutionally required 'to investigate independently every claim of innocence.'" *Id.* (quoting *Baker*, 443 U.S. at 146). Still, though, we emphasized that "after the lapse of a certain amount of time, continued detention in the face of repeated protests will deprive the accused of liberty without due process." *Id.* at 1562 (citation omitted). In short, we held that Parrott had a "constitutional right to be free from continued detention after it was or should have been known that [she] was entitled to release . . . ." *Id.* at 1563.

We must apply that rule—under which state officials violate the Fourteenth Amendment's Due Process Clause by displaying deliberate indifference about a detainee's (mis)identification—in this case. That is so because our prior-precedent rule requires us to follow *Cannon* "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (citation omitted).

And that hasn't happened—the Majority Opinion has not overruled *Cannon*. *See* Majority Op. at 11–13; *but see* Newsom Op. at 11 n.2 (advocating for a *Cannon*-less world). *Cannon* remains good law. And applying its holding requires the answer the

panel reached: Sosa sufficiently alleged a violation of his substantive-due-process rights.

Indeed, Sosa alleged enough facts to bring his case squarely under *Cannon*'s control. Like Parrott, Sosa asserted that "from the time of [his] initial detention at the [traffic stop], []he repeatedly maintained that []he was not [the wanted Sosa]." *Cannon*, 1 F.3d at 1560. In the same way that Parrott's Social Security Number and birth date differed from Mann's Social Security Number and birth date, Sosa's "Social Security Number and date of birth were different from the Social Security Number and date of birth of [the wanted Sosa]." *Id.* at 1564. And just as "Cannon's physical makeup did not match the physical description for Mann," *id.* at 1563, Sosa's physical makeup did not match the physical description for the wanted Sosa's. The two had different heights, weights, and tattooed status (Sosa had none). In fact, according to Sosa, he "explained this in detail to a Martin County deputy named Sanchez as well as some other Martin County jailers and employees in the booking area, who took down his information and claimed they would look into the matter." Not only that, but the warrant on which Sosa was arrested was 26 years old, from halfway across the country, and sought a person with a name thousands of people shared.

On top of all this—and this is the kicker—Sosa also informed the deputies that the Martin County Sheriff's Office had previously mistakenly arrested him on the same wanted Sosa's warrant. Let

that sink in:  The Martin County Sheriff's Office had already made this same mistake once before.

Despite this sea of urgently waving red flags signaling that Sosa was unlikely the wanted, allegedly crack-cocaine-trafficking Sosa, the deputies did nothing for three nights and days to confirm Sosa's identity as the wanted Sosa.  So there Sosa sat.

These allegations sufficiently establish that Sanchez and other deputies at the jail had enough information to know (1) that a substantial likelihood existed that Sosa was not the wanted Sosa and (2) that they had the means readily available to rapidly confirm Sosa's identity.  After all, the same sheriff's office had verified Sosa's identity by fingerprinting just three-and-a-half years earlier when it arrested him in error the first time.  And in 2018, finally, after Sosa spent three nights and days in jail, an unnamed deputy took Sosa's fingerprints—a standard police tool long used by every U.S. police force.  When the deputy did so, he confirmed with ease that Sosa was not the wanted Sosa.

Under these circumstances, the jailers acted with deliberate indifference towards Sosa's due-process rights when they failed for three nights and days to verify that Sosa was the wanted Sosa—in the same way that Collins violated Parrott's due-process rights when he failed, "in the face of [Parrott's] assertions of mistaken identity," to take "any steps to verify" her identity.  *Id.* at 1565.  Given these parallels, Sosa's allegations about the Martin County Sheriff's Office's "failure to take any steps to identify [Sosa] as the

wanted fugitive [are] sufficient" to state a claim that the deputies acted with "deliberate indifference toward [Sosa's] due process rights." *Id.* at 1564.

Relying on two irrelevant facts, the Majority Opinion tries to distinguish Sosa's case from *Cannon*. In the Majority Opinion's view, *Cannon* does not govern here because (1) "the *Cannon* detainee was [not] arrested on a valid warrant supported by probable cause," Maj. Op. at 12, and (2) "the *Cannon* detainee was held for seven days," *id.* But neither distinction excuses compliance with *Cannon*'s rule.

First, the Majority Opinion's distinction between an arrest based on a warrant supported by probable cause (Sosa's case) and a warrantless arrest also supported by probable cause (*Cannon*) is meaningless under *Cannon*. The warrant/warrantless distinction doesn't matter because the arrests in both cases were supported by probable cause, so they were valid. And we're not talking about the arrests; we're talking about the detentions after the arrests. That is so because, as the Majority Opinion's author has explained, "a detention following a valid arrest may present a viable section 1983 claim where the detainee protests the detention on the basis of *misidentification*." *Case*, 555 F.3d at 1330 (W. Pryor, J.) (citing *Ortega*, 85 F.3d at 1527) (emphasis added).

Both *Cannon* and this case concern a valid arrest accompanied by a later, unconstitutional detention. Just as Sosa was arrested roadside on an outstanding warrant, Parrott was arrested at

a roadside rest area after a deputy established probable cause. The deputy in *Cannon* established probable cause after receiving an NCIC "hit" advising that Kentucky wanted a woman with an alias of Mary Parrott. *Cannon*, 1 F.3d at 1560. And as our predecessor Court has explained, "NCIC printouts are reliable enough to form the basis of the reasonable belief which is needed to establish probable cause for arrest." *United States v. McDonald*, 606 F.2d 552 (5th Cir.1979) (citation and quotation marks omitted).

In short, a warrant established the probable cause in Sosa's case while an NCIC information established the probable cause in *Cannon*. That is a distinction without a difference for a claim arising from an unconstitutional overdetention. Rather, what matters is that both Sosa and Parrott were validly arrested based on probable cause. And after that happened, they were transported to the jail, where their jailers were deliberately indifferent to the many indications that Sosa and Parrott were not their sought-after name doppelgangers.

The Majority Opinion's second fact-bound attempt to wriggle out of *Cannon*'s holding—"the *Cannon* detainee was held for seven days"—fares no better. True, Parrott was held for seven days, while Sosa was held for three. But the right *Cannon* recognizes—the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release," *Cannon*, 1 F.3d at 1563—is not triggered by the passing of a

specific amount of time.[7]  Rather, by its terms, the right accrues when the officers knew or should have known that the detainee was entitled to release, and they do nothing.  *Id.* ("The deliberate indifference requirement was adopted based on analogies to eighth amendment situations where the defendant's state of mind was relevant to the issue of whether a constitutional violation has occurred in the first place.").

And here—especially given this appeal's posture, which requires us to view Sosa's allegations in the light most favorable to him—it's clear that the officers knew or should have known that Sosa was not the wanted Sosa well before three nights and days passed.  We know this because, during Sosa's arrest in 2014 on the same warrant, the same sheriff's office fingerprinted and released him no more than *three hours* after detaining him.

If the deputies' knowledge was enough to alert them within three hours that they had the wrong Sosa in 2014, the deputies' knowledge was enough to alert them of that same problem in 2018 well before three nights and three days passed.  In fact, in 2018, the deputies had even more reason to know that they had the wrong Sosa:  unlike in 2014, Sosa told the officers that their office had previously made the same mistake when they arrested him on the

---

[7] As I explain later in this dissent, *see infra* at 23–24, it makes no sense—and has no constitutional grounding—to base a constitutional right on some arbitrary amount of time that the Majority Opinion has plucked out of a hat.

same warrant in 2014.  Plus, the 1992 warrant had only gotten older by 2018, increasing the need to confirm Sosa's identity.  And based on his 2014 experience, in 2018, Sosa was able to explain to officers that he knew he did not match the wanted Sosa's identifiers.  Yet despite these added indicators that they had the wrong man, Martin County deputies held Sosa not for three hours but for three days.

So here, whether Sosa was held for three days or seven days makes no difference to whether the officers violated Sosa's constitutional rights when they continued to detain him after they knew or should have known that he was entitled to release:  in both cases, the jailers knew or should have known well before the passage of the entire detention period that the person detained was entitled to release.

To sum up, then, I can't say it better than the Majority Opinion: "If we treated every factual distinction from a precedential decision as necessarily material, the doctrine of precedent would lose most of its function."  Maj. Op. at 9 (citations omitted).  The Majority Opinion's efforts to distinguish *Cannon* fail because the two factual distinctions it invokes are irrelevant to *Cannon*'s analysis.  So the prior-precedent rule requires the conclusion that *Cannon* controls Sosa's case.

2. *Baker* does not require—or even support—the conclusion that Sosa had no Fourteenth Amendment due-process right to be free from continued detention when it was or should have been known that he was entitled to release.

Given this failure to circumvent our controlling precedent, the Majority Opinion tries another tack.  In its second effort, the Majority Opinion misreads *Baker* and once again invokes immaterial facts—this time to argue that *Baker* supports the decision the Majority Opinion arrives at and precludes the answer I reach.  But *Baker* neither supports the Majority Opinion's answer nor precludes mine.

According to the Majority Opinion, "[u]nder *Baker*, no violation of due process occurs if a detainee's arrest warrant is valid and his detention lasts an amount of time no more than the three days that [the *Baker* plaintiff] was detained."  Maj. Op. at 8.  Of course, Sosa was arrested on a valid arrest warrant, and his detention lasted for three nights and days, so the Majority Opinion points to these two facts and declares "mission accomplished" in rejecting Sosa's position.  But the Majority Opinion declares victory too soon.  Below, I explain why each of the two factual similarities between *Baker* and Sosa's case—the existence of an arrest warrant and a detention for three days—are immaterial to *Baker*'s reasoning and outcome, and why *Baker*'s reasoning actually requires us to conclude that the jail deputies here violated Sosa's constitutional rights.

I start with the three days. As we explained in *Cannon*, *Baker* "recognized . . . that after the lapse of a certain amount of time, continued detention in the face of repeated protests will deprive the accused of liberty without due process." *Cannon*, 1 F.3d at 1562. The Majority Opinion says *Baker* holds that three days can never be enough to qualify as a constitutional deprivation. *See* Maj. Op. at 8.

But the Majority Opinion confuses *Baker*'s *outcome* (three days was not enough under the circumstances in *Baker*) with *the limiting principle* the Supreme Court applied to reach that outcome. In so doing, the Majority Opinion treats three days as some type of magic number that the Supreme Court arbitrarily shook out of a magic 8 ball—or, to use my colleague Judge Newsom's terminology, "ma[d]e . . . up." *See* Newsom Op. at 11.

That is not how the law works, and that is not what the Supreme Court did. Rather, as other courts have acknowledged, *see Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001), and *infra* at 27–29, the Supreme Court applied a legal reason—or limiting principle—to determine that, for the circumstances present in *Baker*, a three-day detention wasn't a constitutional deprivation of liberty.

Recognizing the limiting principle the Supreme Court employed in *Baker* to arrive at that decision is critical to properly applying *Baker* here or in any other case. Only after we identify that limiting principle can we apply it to the facts here to determine whether Sosa's period of detention amounted to an

unconstitutional deprivation of liberty.  But that's a step the Majority Opinion skips.

I therefore turn to *Baker*'s limiting principle.  Some might think that *Baker* offers two possible answers.  One possible limiting principle could be viewed as simply the Sixth Amendment:  that a "detention pursuant to a valid warrant but in the face of repeated protests of innocence will . . . deprive the accused of 'liberty . . . without due process of law,'" *Baker*, 443 U.S. at 145, when it transgresses the Sixth Amendment right to a speedy trial.  The second possible limiting principle is a reasonableness principle:  that the time after which "detention pursuant to a valid warrant but in the face of repeated protests of innocence will . . . deprive the accused of 'liberty . . . without due process of law,'" *id.*, arises when it becomes unreasonable, under the totality of the circumstances, not to verify the arrestee's identity.  For the reasons I explain below, *Baker*'s limiting principle must be the latter.

I begin with the possible answer that the limiting principle is tied to the Sixth Amendment speedy-trial right.  This possible answer comes from this passage in *Baker*, which mentions the right to a speedy trial:

> Obviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment.  For the Constitution likewise guarantees an accused the right to a speedy trial . . . .

443 U.S. at 144. But for two reasons, the speedy-trial right cannot be the limiting principle governing when the right to be free from continued detention after it was or should have been known that the detained person is entitled to release kicks in.

*First*, our binding precedent forecloses that reading of *Baker*. To begin with, we certainly did not understand *Baker* that way in *Cannon*. Not only did Parrott not invoke her speedy-trial rights, but *Cannon* lacks any reference to that right. *See generally Cannon*, 1 F.3d 1558. And more to the point, if we thought *Baker*'s limiting principle were the speedy-trial right, we could not have decided *Cannon* the way that we did: the seven days Parrott spent in custody were not nearly enough to establish that Collins violated Parrott's speedy-trial rights. As we explained in *Knight*, a delay in bringing a defendant to trial does not become "presumptively prejudicial"—and therefore does not violate his speedy-trial rights—until the delay "approaches one year." 562 F.3d at 1323 (citation omitted). Obviously, seven days is appreciably less than a year, so it is not "presumptively prejudicial." So if we had read *Baker*'s limiting principle to be based on the right to a speedy trial, we could not have concluded that the seven-day detention period in *Cannon* violated Parrott's constitutional rights. But of course, we did conclude that the seven-day detention period in *Cannon* violated Parrott's constitutional rights. So we obviously did not view *Baker*'s limiting principle as resting on the Sixth Amendment speedy-trial right.

And *second*, even without considering *Cannon*, this reading of *Baker* is still wrong. That is because *Baker* follows its mention of the speedy-trial right with this statement:

> We may even assume, *arguendo*, that, depending on what procedures the State affords defendants follow-ing arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law."

443 U.S. at 145.[8]  This passage does not invoke the speedy-trial right. Rather, it recognizes that neither that right nor other post-

---

[8] Of course, I recognize that this statement is dicta. But as we have explained, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). And "[w]e have pre-viously recognized that 'dicta from the Supreme Court is not something to be lightly cast aside.'" *Id.* (citation omitted). Indeed, we applied this dicta in *Can-non*. 1 F.3d at 1562 ("The *Baker* Court recognized, for example, that after the lapse of a certain amount of time, continued detention in the face of repeated protests will deprive the accused of liberty without due process."). And we aren't the only ones. At least seven of our sister circuits have also applied the same dicta. As I've noted, some have done it in the same situation as we have here. *See, e.g.*, *Russo*, 479 F.3d at 209; *Gray*, 150 F.3d at 582; *Fairley v. Luman*, 281 F.3d 913, 917–18 (9th Cir. 2002). And others have applied *Baker*'s dicta in other contexts. *See, e.g.*, *Schneyder*, 653 F.3d at 330–31; *Armstrong v. Squadrito*, 152 F.3d 564, 575–76 (7th Cir. 1998); *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 433, 433 n.5 (5th Cir. 2017) (also citing *Baker* to "reject any sugges-tion that the Sixth Amendment's speedy-trial clause serves as the only limit on

arrest procedures may be enough to protect a misidentified person arrested under a warrant against deprivation of liberty without due process of law. Put simply, an overdetention claim exists independently of a claim for any other constitutional violation, including a speedy-trial violation.

This brings me to what *Baker*'s limiting principle actually is: a reasonableness test. The Supreme Court's decision in *Baker* turned on the notion that "detention pursuant to a valid warrant but in the face of repeated protests of innocence will . . . deprive the accused of 'liberty . . . without due process of law,'" *id.*, when it becomes unreasonable, under the totality of the circumstances, not to verify the arrestee's identity. *Baker* shows why that is so.

In *Baker*, Leonard McCollan obtained a duplicate of his brother—the plaintiff—Linnie's driver's license. *Id.* at 140. Leonard's[9] version of the license was the same as Linnie's in every way, except that the photo was of Leonard. *Id.* So when Leonard was arrested on narcotics charges, he was booked as Linnie. *Id.* at 140–41. Leonard also signed documents during his arrest as Linnie and was released on bail as Linnie. *Id.* at 141. As a result, the police (reasonably) believed that they had arrested Linnie.

---

prolonged pretrial detention"); *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 673 (8th Cir. 2004).

[9] To avoid confusion, I use the McCollans' first names in my discussion of *Baker*.

Then Leonard skipped bond after his release on bail, and Leonard's bondsman procured a warrant out of Potter County, Texas, for the arrest of "Linnie Carl McCollan." About two months later, a police officer pulled over Linnie for a traffic stop in Dallas, Texas. *Id.* The police officer arrested Linnie on Leonard's warrant (issued against Linnie). *Id.* Linnie was then transferred to the custody of the deputies in the county from where the warrant issued. *Id.* He remained there for three nights over the New Year's holiday weekend, until officials, in comparing Linnie's appearance to the file photo of the wanted person, realized that Linnie was not that man. *Id.* Linnie sued the county sheriff under § 1983, alleging that the county's custody of him violated his Fourteenth Amendment rights. *Id.* The Supreme Court disagreed. *Id.* at 146–47.

In reaching this conclusion, the Court acknowledged that "**one in [Linnie's] position** could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Id.* at 144 (emphasis added). Then, the Court suggested that a state's procedures or lack thereof, **depending on** what those procedures were, could violate a detainee's due-process right to liberty. *Id.* at 145. And finally, it concluded, "[W]e are quite certain that a detention of **three days over a New Year's weekend** does not and could not amount to such a deprivation." *Id.* (emphasis added).

In other words, in determining that Baker had not violated Linnie's constitutional rights when he did not release Linnie for three days after Linnie was arrested, the Court accounted for the peculiarities of each of the following three things: (1) Linnie's situation; (2) the procedures the state provided to ensure Linnie was the wanted person; and (3) the period during which Linnie was detained. On its face, this, of course, is a totality-of-the-circumstances analysis. *See Lee*, 250 F.3d at 684 (recognizing that the *Baker* Court considered the circumstances in evaluating whether Linnie's constitutional rights had been violated).

In applying that totality-of-the-circumstances reasonableness test, the Supreme Court implicitly considered the following: (1) that Linnie's name was on the warrant he was arrested on; (2) that Linnie's name was on there because his brother Leonard had "masquerad[ed] as Linnie" and had a driver's license with Linnie's name on it when he was booked on drug charges and released on bail; and (3) that the three-day period over which Linnie was held was the three-day 1973 "New Year's weekend." *See id.* at 140–45. The first two considerations explained why determining whether Linnie was, in fact, the wanted person was not simple and straightforward. The third consideration evaluated the reasonableness, under the circumstances, of expecting the officers to "investigate" Linnie's claims of innocence. *See id.* at 145–46.

In 1972 and 1973, when Linnie was arrested and detained, that effort was significant enough that the Supreme Court referred

to it as a need to "investigate." *Id.* at 146.  No wonder.  For those who weren't around in the pre-digital days of typewriters (and Liquid Paper for correcting errors), "snail" mail, and records rooms filled floor to ceiling with files, I briefly detour to describe what verifying identity required back then.

In the early '70s, an officer who wanted to confirm that he had the right detainee first would have had to obtain a paper copy of the file for the wanted person because that's where the wanted person's identification information would have been located.[10] But the paper file very well might not be stored at the jail.  If the jail didn't have the file, the officer would have had to ask, and then wait, for the file to be mailed or messengered to her.  Depending on the circumstances (like whether it was a three-day holiday weekend), the time that process took could vary appreciably.

And even if the officers stored the paper file on the jail premises, the file likely would have been in a restricted-access records room (so law enforcement could keep track of who had the paper file at any particular time).  That meant that our officer would have

---

[10] In 1972 and 1973, even facsimile machines were not widely used and were extremely expensive (about $18,000 then).  Lynn Simross, "*The Fax Revolution: At Home and at Work, Facsimile Machines Have Become the Essential Business Tools*," LOS ANGELES TIMES (Sept. 11, 1991), https://www.latimes.com/archives/la-xpm-1991-09-11-vw-1950-story.html.  And the best ones took about six minutes to transmit a single page and weighed in at about 100 pounds.  *Id.*  Fortune 500 companies were the ones who used them.  *Id.*  This remained the case until the late 1980s.  *Id.*

needed to (1) physically go to the records room and (2) hope or plan that someone would be there to sign the file out. Then, if the officer compared a photograph of the wanted person to the arrested person, that officer might not have been unable to make a definitive identification. So the officer might have needed to conduct a fingerprint comparison. And if the officer had wanted to do that, he generally would have had to send the fingerprint cards of both the wanted person and the arrested person to an expert (or the FBI) for a manual comparison. Of course, that added time for physical shipment in each direction. On top of that, the expert then would have had to engage in the time-intensive process of manually examining both sets of fingerprints to see whether they shared at least a certain number of the same features. This type of investigation could require "weeks or months." *Maryland v. King*, 569 U.S. 435, 459 (2013).

And that burden mattered in the Supreme Court's assessment of whether, under the totality of the circumstances, the actions of the *Baker* officers were reasonable. As the Court explained, again showing it was applying a totality-of-the-circumstances analysis, "[d]ue process does **not** require that every conceivable step be taken, **at whatever cost,** to eliminate the possibility of convicting an innocent person." *Baker*, 443 U.S. at 145 (emphasis added) (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977)). In this respect, the Court emphasized that Linnie was detained for not just three days but for "three days over a New Year's weekend." *Id.* at 145.

The Majority Opinion just dismisses this fact.  It justifies its refusal to acknowledge the importance of the holiday period—one that the Supreme Court itself relied on—by saying that "detainees have the same due-process rights on holidays as they do every other day of the year, so the incidence of a holiday does not change our constitutional analysis."  *See* Maj. Op. at 10.  But we have no business ignoring the Supreme Court's treatment of the New Year's holiday period as material to its decision.  After all, "the principle of the case[] is not found in the reasons or the rule of law set forth in the opinion, nor by a consideration of all of the ascertainable facts of the case and the judge's decision. . . . [T]he principle of the case is found *by taking account of the facts treated by the judge as material* and his decision upon them, taking also into account those facts treated by him as immaterial."  *Tex. & P. Ry. Co. v. La. Oil Refin. Corp.*, 76 F.2d 465, 467 (5th Cir. 1935) (citation and quotation marks omitted) (emphasis added).

And more significantly, the Majority Opinion's excuse for ignoring the Supreme Court's reliance on the New Year's holiday weekend in its rationale doesn't pan out anyway:  the constitutional right the Supreme Court identified (that detainees have on holidays and every other day) is the right to that amount of process that is reasonable under the totality of the circumstances.  And as *Baker* indicates, what is reasonable during a New Year's weekend may be quite different from what is reasonable during a non-holiday period.

New Year's weekend is known for being a time when, traditionally, less essential public services are not fully staffed. So during that holiday period, it was unreasonable to expect officers operating in a lightly staffed jail to leave the jail to physically locate the file on Leonard (or find an officer outside the jail to retrieve the file and take it to the jail), review it, compare the photograph of the wanted individual to Linnie, possibly analyze the fingerprints, and recognize that the two were different people. But as I discuss below, now, confirming identity is worlds easier and faster (and requires far less effort).

Other courts have also recognized that the nature of the particular three-day period for which Linnie was detained mattered to the Supreme Court's conclusion that the sheriff in *Baker* did not violate Linnie's constitutional rights. For example, in *Patton v. Przybylski*, the Seventh Circuit construed *Baker* as having discounted non-business days in determining the length of the period the *Baker* jailers had to confirm Linnie's identity. 822 F.2d 697, 700 (7th Cir. 1987). And in *Lee*, the Ninth Circuit rejected the defendants' argument there that, under *Baker*, the plaintiff's "due process claim must fail at the pleading stage because he was incarcerated for only one day before his extradition hearing . . . ." 250 F.3d at 684. Rather, the Ninth Circuit explained, Linnie's claim in *Baker* failed based on the "circumstances" there. *See id.* That is, the Ninth Circuit applied *Baker*'s totality-of-the-circumstances test to conclude that a one-day incarceration violated the plaintiff's due-process rights there.

Yet in a single, conclusory sentence, the Majority Opinion announces, "Nor did the Court rely on the unstated 'limiting principle' of reasonableness that our dissenting colleague has discerned from *Baker*." Maj. Op. at 9 (citation omitted). The Majority Opinion fails to grapple with the Court's deliberate word choices and analysis showing that it applied a reasonableness-under-the-totality-of-the-circumstances test. Instead, as I've mentioned, it asks us to consider only *Baker*'s result while disregarding the rest of the opinion as though it is fluff. Based on the Majority Opinion's interpretation of *Baker*, the Supreme Court arrived at an unreasoned conclusion that three days' detention after a valid arrest can never, under any circumstances, be enough to state a constitutional claim, and it did so by applying no rule, instead engaging in a judicial game of magic 8 ball. Most respectfully, I cannot agree to do that. The Supreme Court's *Baker* analysis is reasoned, and we must abide by the reasoning that animates it.

When we apply *Baker*'s reasonableness-under-the-totality-of-the-circumstances limiting principle here, we must conclude that Sosa has stated a constitutional claim. Six facts make the circumstances in this case differ materially from those in *Baker*—all in ways that favor Sosa's claim.[11] Indeed, even the Majority Opinion

-----

[11] The Newsom Concurrence points to these six differences between *Baker* and Sosa's case as evidence of the "freewheelingness" of the substantive-due-process analysis. Newsom Conc. at 6. But totality-of-the-circumstances tests (which necessarily depend on the factual circumstances of the given case) like the limiting principle that controls *Baker* are not unique to substantive-due-

does not argue that Sosa's claim fails under a reasonableness-under-the-totality-of-the-circumstances test. So we turn to the six material differences.

First, Sosa was arrested and detained in 2018, not 1972 and '73. While fingerprinting was standard practice upon booking at both times,[12] confirming identity was a lot more time-consuming in 1972 and '73 than it was in 2018. Unlike the labor-intensive,

---

process analysis in constitutional law. Totality-of-the-circumstances tests also govern the analysis when a litigant raises an allegation of the violation of certain enumerated constitutional rights. The Fourth Amendment provides a good example. We determine whether a search or seizure is constitutionally permissible under the Fourth Amendment by evaluating the totality of the circumstances. *See, e.g., Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1250 (11th Cir. 2022). We also assess excessive-force claims under the Fourth Amendment by looking to reasonableness under the totality of the circumstances. *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021). Similarly, we apply a totality-of-the-circumstances test when we consider whether a person has waived his Fifth Amendment right against self-incrimination. *United States v. Smith*, 821 F.3d 1293, 1304–05 (11th Cir. 2016). Totality-of-the-circumstances tests are prevalent in and significant to constitutional jurisprudence because we have recognized the sometimes-competing needs and interests of our government and of individuals' rights to be free from government tyranny. And totality-of-the-circumstances tests help to strike a balance between these sometimes-dueling interests.

12 *See, e.g., Police Booking Procedure*, FINDLAW, https://www.findlaw.com/criminal/criminal-procedure/booking.html (last visited Jan. 19, 2023); *see also King*, 569 U.S. at 459 ("By the middle of the 20th century, it was considered elementary that a person in lawful custody may be required to submit to photographing and fingerprinting as part of routine identification processes.") (cleaned up).

multi-day process in the early '70s, in 2018, pressing a button on the computer to see if a detainee's fingerprints matched a wanted person's fingerprints was all it took to confirm identity.

That is so because the FBI launched the Integrated Automated Fingerprint Identification System ("IAFIS") in 1999. *King*, 569 U.S. at 459. And that heralded the start of "rapid analysis" of fingerprints. *Id.* "Prior to this time, the processing of fingerprint submissions was largely a manual, labor-intensive process, taking weeks or months to process a single submission." *Id.* (cleaned up). Still, as speedy as IAFIS was, its creation was only a pit stop in the government's race to rapidly provide identification information to law-enforcement officials. The government continued to make improvements, and in 2016—still before Sosa's 2018 arrest—the government renamed IAFIS the Next Generation Identification ("NGI") system "to more fully describe the features and capabilities of the system" at that time. Privacy Act of 1974; Implementation, 82 Fed. Reg. 35,651 (Aug. 1, 2017). Those features include "the increased retention and searching of fingerprints" and other biometric services. *Id.* And as the name reflects, a major purpose of the system is to definitively "[i]dentif[y]" individuals who make their way to the criminal-justice system. *Id.* at 35,652.

As particularly relevant here, NGI has a rapid search function that is accessible to law-enforcement officers nationwide. Next Generation Identification (NGI), FBI, https://le.fbi.gov/science-and-lab-resources/biometrics-and-

fingerprints/biometrics/next-generation-identification-ngi      (last visited Jan. 19, 2023). Notably, that function allows for fingerprints from a detainee to be compared to those in a "national repository of wants and warrants" and has "response times of *less than 10 seconds*." *Id.* (emphasis added). So unlike in 1972, when the process could have required "weeks or months," in 2018, an officer like Sosa's jail deputies could confirm an identity (or as relevant here, clear up a misidentification) with less than a minute's work.[13]

Second, the circumstances here also differ from those in *Baker* in that no one "set up" Sosa the way that Leonard did his brother Linnie. In *Baker*, the officers who put out the be-on-the-lookout warning thought they were, in fact, looking for Linnie. But in Sosa's case, the officers were not under the mistaken impression that they were looking for Sosa; they were simply looking for someone with the name "David Sosa." That is, the officers weren't purposefully misled the way the *Baker* officers were.

That difference is key. When a person has been framed—or even when officers otherwise mistakenly believe the wrong person has committed a crime—a substantive "investigation," in the Supreme Court's words, *Baker*, 443 U.S. at 146, is necessary to clear the person wrongly suspected of having committed the crime. An

---

[13] And even if a given search were to require longer to return results, that would not increase by any more than a negligible amount the effort the jail officer who input the fingerprint information would have to invest. Rather, it would simply require the officer to check the results a little while later.

"investigation" can require a lot of time, effort, and leg work. And it would be neither practical nor reasonable to expect jailers to engage in these activities, along with their other duties.

But when officers never believed they were looking for the arrested person and arrested him only because they misidentified him as the person they were looking for, no "investigation" to clear up the mistake is necessary. *See Investigation*, Oxford Dictionaries, https://premium.oxforddictionaries.com/us/definition/american_english/investigation (last visited Jan. 19, 2023) (describing an "investigation" as "[a] formal inquiry or systematic study"). Rather, a simple NGI fingerprint comparison definitively, easily, and quickly resolves the misunderstanding. And because fingerprinting is standard operating procedure in American jails today, performed for the very purpose of identifying detainees, expecting jailers to engage in this activity imposes no additional burden on them.

The third circumstance that distinguishes this case from *Baker* is that Sosa's arrest occurred in Florida 26 years after Texas issued the warrant he was arrested on, while Linnie's happened only two months after Leonard skipped bail in the same state. That lapse of time and geographical difference further amplified the likelihood in Sosa's case that an identity error may have occurred.

Fourth, unlike Linnie, Sosa matched almost none of the identifiers for the wanted Sosa. And he repeatedly advised officers

of this fact and that they had previously mistakenly arrested him on the same warrant just a few years earlier.

Fifth, Sosa's name is much more common than Linnie's—there were thousands of "David Sosas" in the United States during the relevant period. That made it statistically far less likely that any particular arrested person named "David Sosa" would be the wanted Sosa than that Linnie McCollan was the wanted Linnie McCollan. Given the thousands of David Sosas in the United States (and especially in light of Sosa's protests and the differences in identifiers between Sosa and the wanted Sosa), the officers' chances of getting selected to play *Jeopardy!* would have been greater than their chances of having the correct David Sosa in custody.[14]

And sixth, though two of the days Sosa was imprisoned fell over the weekend,[15] unlike in *Baker*, no holiday was involved. Nor is there any other indication that the jail was understaffed in comparison to other days (and certainly not so understaffed as not to

---

[14] According to now-*Jeopardy!* host Ken Jennings, "it's 10 times harder to get on 'Jeopardy!' than to get into Yale." *See* Lottie Elizabeth Johnson, *The online 'Jeopardy!' test is about to happen and Ken Jennings is here to help you succeed*, DESERET NEWS (Apr. 4, 2019), https://www.deseret.com/2019/4/4/20670100/the-online-jeopardy-test-is-about-to-happen-and-ken-jennings-is-here-to-help-you-succeed#in-advance-of-the-online-jeopardy-test-which-is-available-april-9-11-jeopardy-legend-ken-jennings-shared-test-taking-tips-with-the-deseret-news.

[15] Sosa was arrested on a Friday—a weekday—and released at 3:00 p.m. on a Monday.

be able to run a ten-second fingerprint comparison), as the Supreme Court's remark about the "three-day holiday weekend" reflects it concluded the jail likely was in *Baker*.

So when we apply *Baker*'s limiting principle—the time after which "detention pursuant to a valid warrant but in the face of repeated protests of innocence will . . . deprive the accused of 'liberty . . . without due process of law,'" *Baker*, 443 U.S. at 145, accrues when it becomes unreasonable, under the totality of the circumstances, not to verify the arrestee's identity—here, we can reach only one conclusion: that the officers violated Sosa's constitutional rights.

In sum, unlike in *Baker*, no one was trying to trick the officers into thinking Sosa was the wanted Sosa; the several signs suggesting that Sosa was not the wanted Sosa practically hit the officers over the head; the officers could have easily confirmed that Sosa was not the wanted Sosa with less than a minute of an officer's time engaging in a standard jail operating procedure; and nothing in the record reveals that the jail was short-staffed or was experiencing any kind of crisis during the period Sosa was there. Under these circumstances, it was simply unreasonable for the officers to have waited three nights and three days while Sosa sat in jail before they even tried to confirm Sosa's identity.[16]

---

[16] Of course, because *Baker* applies a totality-of-the-circumstances test, some circumstances might justify longer periods of detention before identity

The Majority Opinion errs because it does not bother to determine and apply *Baker*'s limiting principle. Rather, it rigidly insists on substituting the *result Baker* reached after applying its limiting principle—that the three days in *Baker* did not violate Linnie's rights—for the *limiting principle* itself. Then, it incorrectly describes the results of *Baker*'s application of its limiting principle as the limiting principle itself: that three days can never violate a detainee's constitutional rights. And because Sosa spent three days in jail, the Majority Opinion incorrectly concludes that *Baker* precludes the finding that the jail officers violated Sosa's constitutional rights.

Properly read, though, *Baker* and its reasonableness-under-the-totality-of-the-circumstances principle support the conclusion that Sosa sufficiently alleged that Sanchez and the other jailers violated his constitutional rights. After all, despite strong reason to suspect Sosa was not the wanted Sosa, the officers refused for three nights and three days to invest less than a minute of work to confirm Sosa's identity, while all the time, Sosa remained in jail. Under the totality of the circumstances, that is not just unreasonable but extraordinarily so. And *Baker*'s limiting principle does not tolerate it.

---

confirmation. For example, confirming identity on the date of arrest might not be reasonable in situations where a prolonged power outage persisted, a natural disaster with life-safety issues occurred, or an unavoidable lack of staff that potentially jeopardized safety happened.

    B.  *Sosa's Fourteenth Amendment due-process right to be free from continued detention when it was or should have been known that Sosa was entitled to release was clearly estab-lished when the Martin County jailers violated it.*

Because Sosa sufficiently alleged that Sanchez and the other jail deputies violated his Fourteenth Amendment due-process rights under our precedent, I next consider whether that right was clearly established when the alleged violation occurred. I conclude that it was.

A right is clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (cleaned up). So though the Supreme Court or we need not have held "the very action in question" to be unlawful, the unlawfulness of the action "must be apparent" under the law in existence at the time of the violation. *Id.* at 1312 (cleaned up).

As relevant here, we have recognized that a plaintiff can show that a constitutional right was clearly established when the violation occurred by pointing to "a broader, clearly established principle [that] should control the novel facts" of the case under review. *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010) (citation and quotation marks omitted). To be sure, the Supreme Court has recently emphasized that the clearly established inquiry "must be undertaken in light of the specific context of the case, not

as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (citation and quotation marks omitted). At the same time, though, the Court has continued to recognize that its "case law does not require a case directly on point for a right to be clearly established." *Id.* at 7–8. And we have not said that *Rivas-Villegas* abrogated our case law that holds that a plaintiff may show that a right is clearly established by "point[ing] to a broader, clearly established principle that should control the novel facts of the situation," *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013) (W. Pryor, J.) (cleaned up). So the question we must focus on is whether "every reasonable official would have understood that what he is doing violates [the particular] right." *Rivas-Villegas*, 142 S. Ct. at 7 (citation and quotation marks omitted).

In satisfying the burden to prove his right was clearly established, the plaintiff must rely on "law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida." *Keating*, 598 F.3d at 766. (citation and quotation marks omitted).

Here, *Cannon* recognized "[t]he constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Cannon*, 1 F.3d at 1563. We also held in *Cannon* that the deputy's "failure [there] to take any steps to identify [the detained person] as the wanted fugitive was sufficient to raise a question of fact as to his deliberate indifference toward [the detained plaintiff's] due process rights." *Id.* at 1564.

These principles we announced more than 25 years before the jail deputies encountered Sosa in 2018 control Sosa's case and put the deputies on notice. They require a showing of two things: (1) the officer had good reason to know that he had a misidentified person wrongly in custody, and (2) despite that knowledge, he did nothing to confirm the person's identity as the wanted person. *See Cannon*, 1 F.3d at 1563–64. Sosa has sufficiently alleged both these things.

First, Sosa alleged that (a) he matched almost none of the identifiers for the wanted Sosa; (b) he repeatedly advised Sanchez and other jail deputies that he matched almost none of the identifiers for and was not the wanted Sosa; (c) he repeatedly told these same deputies that their Sheriff's Office had previously mistakenly arrested him on the same warrant a few years earlier; (d) and these deputies acknowledged to him at the time he was booked into the jail that they would look into it. Second, despite knowing of the substantial likelihood that Sosa was not the wanted Sosa and promising to address that concern, for three nights and days, Deputy Sanchez and the other jail deputies took no action to identify Sosa as the wanted Sosa. Instead, they decided to remain deliberately indifferent to Sosa's entitlement to release. And they did that even though they could have confirmed that he was not the wanted Sosa in under a minute. The deputies' deliberate indifference here maps directly and specifically onto the principles we announced in *Cannon*. Indeed, the type of deliberate inaction that the deputies engaged in is precisely the type we denounced in *Cannon*.

*Cannon* informed these deputies that they were violating Sosa's rights as soon as they knew they had strong reason to believe Sosa was not the wanted Sosa and they chose to do nothing.[17] *Cf. Patel v. Lanier Cnty.*, 969 F.3d 1173, 1190 (11th Cir. 2020) (holding that the "broad principle" that "[t]he knowledge of the need for medical care and intentional refusal to provide that care" constitutes deliberate indifference had put "all law-enforcement officials on notice that if they actually know about a condition *that poses a substantial risk of serious harm* yet do *nothing* to address it, they violate the Constitution") (first emphasis added).   And as I've noted, we reaffirmed *Cannon*'s holding repeatedly after we issued it in 1993 and before Sosa was detained in 2018.  *See Ortega*, 85 F.3d at 1526–27; *Campbell*, 586 F.3d at 840; *Case*, 555 F.3d at 1330; *May*, 846 F.3d at 1329.

Not only that, but at least five of our sister circuits have recognized that *Cannon* established "[t]he constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release."  *See, e.g., Russo*, 479 F.3d at 207 ("Following *Baker*, the Eleventh Circuit recognized

---

[17] As I've noted, I base my analysis on the facts as alleged by Sosa and viewed in the light most favorable to him.  *See Lanfear v. Home Depot Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).  Should the actual facts establish that Sanchez and the other deputies did not fail to take any readily available, easy steps to confirm Sosa's identity, in response to the information Sosa provided, within a reasonable period (considering their other pressing obligations), they would have qualified immunity from suit.

a Fourteenth Amendment due process right 'to be free from continued detention after it was or should have been known that the detainee was entitled to release.'"); *Schneyder*, 653 F.3d at 330 (citing *Cannon* and noting that "numerous courts have reached the almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement 'after it was or should have been known that the detainee was entitled to release'"); *Martinez v. Santiago*, 51 F.4th 258, 262 n.2 (7th Cir. 2022) (describing *Cannon* as "recognizing right to be free from 'continued detention after it was or should have been known that the detainee was entitled to release'"); *Davis v. Hall*, 375 F.3d 703, 714 (8th Cir. 2004) ("[T]he Eleventh Circuit has held that prisoners have a 'constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'"); *Lee*, 250 F.3d at 683 (noting that the Eleventh Circuit has "explained [that] a detainee has 'a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release'"); *see also Gray*, 160 F.3d at 276 (citing *Cannon* to support remand for "trier of fact" to determine "whether [defendants] acted with something akin to deliberate indifference in failing to ascertain that the Dwayne Gray they had in custody was not the person wanted by the Michigan authorities on the outstanding parole-violation warrant"). It's hard to see how the principle could not have been clearly established for Deputy Sanchez and the other jail deputies when at least four other circuits understood it to be so before Sosa's 2018 encounter (and a fifth recognized as much just last year).

In sum, over the past 30 years, we have repeatedly reaffirmed *Cannon*'s principle that detainees have a "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release," and even our sister circuits have recognized that *Cannon* established that right. Given these facts, our precedent "placed the . . . constitutional question beyond debate." *Reichle*, 566 U.S. at 664. And it is not unfair to Deputy Sanchez and the other jail deputies to hold them to these principles. Deputy Sanchez and the other deputies at the jail are not entitled to qualified immunity.

For these reasons, I would reverse the district court's dismissal of Sosa's overdetention claim and remand for further proceedings.

III. **The right to be free from continued detention after it was known or should have been known that the defendant was entitled to be released should be rehomed as a Fourth Amendment right.**

As I've explained, our precedent long ago clearly established the substantive-due-process right to be free from continued detention when it was known or should have been known that the person was entitled to release. *See supra* at Section II. But if we were

writing on a clean slate, I would conclude that this right finds its home in the Fourth Amendment.[18]

The Fourth Amendment protects against "unreasonable . . . seizures." U.S. Const. amend. IV. As the Supreme Court has explained, the "touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 US 398, 403 (2006). And seizures—including those of the person—that are not supported by probable cause are unreasonable.

---

[18] As I've noted, it makes no difference to the qualified-immunity analysis where the right lives, as long as the right was clearly established before the deputies' actions (or inactions, in this case). *See supra* at n.6 (citing *Russo*, 479 F.3d at 208–09; *Wilson*, 209 F.3d at 716; and *Alexander*, 916 F.2d at 1398 n.11). The Second and Third Circuits—I believe correctly—root the right in the Fourth Amendment. *Russo*, 479 F.3d at 208–09; *Schneyder*, 653 F.3d at 319–22, 330. The right more appropriately belongs under the Fourth Amendment because, as I explain above, it falls naturally within the Fourth Amendment's prohibition against "unreasonable . . . seizures," U.S. Const. amend. IV. And "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Though, in my view, the Fourth Amendment more appropriately encompasses the right, to be clear, I do not vote to abrogate *Cannon*. That is so because, as I've noted, the specific constitutional source of the right does not affect whether the right is clearly established, and abrogating *Cannon* without recognizing that the right falls under the Fourth Amendment (as the Newsom Concurrence suggests) would wrongly purport to erase the right altogether.

When we speak of probable cause, we refer to the existence of "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed . . . an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (cleaned up).  Notably, this definition requires probable cause to believe two things: first, that a crime was committed, and second, that the person in custody is the one who committed the crime.  At the risk of stating the obvious, if only probable cause to believe that a crime was committed were required for an arrest, anyone could be arrested, without respect to who committed the crime.  So when it comes to the probable-cause inquiry as it relates to arrests on valid warrants—where the warrant itself evidences the existence of probable cause that a crime was committed by a certain person—we focus on the probable cause to believe the person in custody is the certain one who committed the crime.

In making that assessment, once again, reasonableness is our guiding light.  We look to "the totality of the circumstances to determine the reasonableness of the officer's belief" that the suspect is, in reality, the person sought in the warrant.  *See Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("reaffirm[ing] the totality-of-the-circumstances that traditionally has informed probable cause determinations").

Because reasonableness under the circumstances drives our determination of whether probable cause exists in any particular situation, the Supreme Court has described probable cause as a

"flexible, common-sense standard." *Gates*, 462 U.S. at 239; *see also Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) (noting that "probable cause determination depends on the circumstances"). "This standard . . . represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Gerstein*, 420 U.S. at 112.

So, for example, in a roadside arrest on a warrant—where an officer's safety can be very much at issue and an officer may be alone or present with only one other officer—the probable-cause standard for ensuring the arrested person is the wanted person requires less from officers. *See, e.g., Rodriguez v. Farrell*, 280 F.3d 1341, 1347 n.15 (11th Cir. 2002) ("Trials of guilt or innocence cannot be undertaken by police officers on the side of the road in the middle of the night before an officer can effect a lawful arrest pursuant to a valid warrant."). For this reason, under our precedent, Deputy Killough's roadside arrest of Sosa on the wanted Sosa's warrant satisfied probable cause, even though Sosa matched only the name, sex, and race of the wanted Sosa.

But in a non-emergency situation, when an officer has more time and resources available to ensure she is arresting the person whom the warrant actually seeks, the probable-cause standard demands more. *See, e.g., Tillman*, 886 F.2d at 321 ("This is not a case where time was of the essence in making the arrest. Sheriff Coley had at least three months to resolve his doubts about [the plaintiff's] identity."). And there is no doubt that, on this record, arresting Sosa on the wanted Sosa's warrant in a non-emergency

situation would have failed miserably to satisfy the Fourth Amendment's probable-cause standard.

To be sure, the Supreme Court has said that "the probable cause standard for pretrial detention is the same as that for arrest." *Baker*, 443 U.S. at 143. But for four reasons, under the Fourth Amendment, that cannot excuse jailers from timely verifying the identity of those in custody when they can reasonably do so.

*First*, a lot has changed since the 70s, when the Supreme Court issued *Baker*, but it remains the case that the lifeblood of the Fourth Amendment continues to be reasonableness. And "reasonable" now means the same thing it did when the Fourth Amendment was adopted: "agreeable to the Rules of Rea[s]on; ju[s]t, right, con[s]cionable." *Compare Reasonable*, N. Bailey, Universal Etymological English Dictionary (1770), *with Reasonable*, Black's Law Dictionary (11th ed. 2019) ("1. Fair, proper, or moderate under the circumstances; sensible <reasonable pay>.").

So in 1972 or '73, asking a jail deputy to drop everything to fetch a physical file, send off fingerprints, and wait for confirmation of identity was unreasonable because (1) it required a lot of time that deputies needed for their other responsibilities, and (2) engaging in this exercise wouldn't have confirmed identity with certainty for weeks or months. But now, running a fingerprint comparison requires less than a minute of work for a jail deputy, and its results can definitively prove that an arrestee is or is not the wanted person. As a result, refusing to perform such a comparison before subjecting an arrested person to days and nights in jail simply isn't

"just, right, or conscionable,"—i.e., "reasonable,"—and it doesn't comply with the Fourth Amendment's promise against "unreasonable" seizures.

That changes the Fourth Amendment reasonableness calculus considerably. Take this case, for instance. As a reminder, Sosa was arrested because he shared the same name, sex, and race as the wanted Sosa. But so did thousands of other people. And while, under our precedent, that satisfies probable cause for roadside-arrest purposes, it is certainly not the type of "safeguard . . . from rash and unreasonable interferences with privacy and from unfounded charges of crime," *Gerstein*, 420 U.S. at 112, that the Fourth Amendment's reasonableness standard anticipates when definitively exculpatory identity information is instantaneously available to jail deputies. Indeed, jailing the wrong person for three nights and days when it is now possible to instantaneously and easily determine that he is not wanted has to be pretty high up on the list of "unreasonable interferences with privacy and . . . unfounded charges of crime" that the Fourth Amendment protects against. *Id.*; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018) (recognizing that the Fourth Amendment "seeks to secure 'the privacies of life' against 'arbitrary power'") (citation omitted). Even setting aside the emotional stress of a three-day detention that results from a misidentification, three days confined to a jail cell can inflict other serious consequences on a person. *See Gerstein*, 420 U.S. at 114 (noting that "pretrial confinement may imperil the

[arrestee's] job, interrupt his source of income, and impair his family relationships").

So if the Fourth Amendment's reasonableness standard means anything, it cannot tolerate confining an innocent person to a jail cell for three nights and three days (based solely on the fact that he shares common characteristics without thousands of other men), when a ten-second fingerprint comparison could definitively reveal that the arrestee is not the wanted person. By any measure, that is outrageously unreasonable. And it is hard to see how legal process in the form of a valid warrant for some David Sosa—when thousands exist and Sosa matched only the wanted Sosa's name, sex, and race—could satisfy the Fourth Amendment for purposes of continuing to detain Sosa for days after the jail deputies reasonably could have confirmed that Sosa was not the wanted Sosa. *Cf. Manuel v. City of Joliet*, 137 S. Ct. 911, 919–20 (where judge detained plaintiff based on criminal complaint that was supported solely by arresting officer's lies, holding that "[i]f the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment").

*Second* and relatedly, the Fourth Amendment's concept of probable cause inherently requires identity confirmation at the earliest reasonable time to support an ongoing seizure of a person—especially when the person is arrested in an emergency type of situation. As I've noted, our precedent finds probable cause satisfied in a situation like Sosa's roadside arrest. The Supreme Court has

explained these types of seizures in part by pointing to roadside arrests of individuals like Timothy McVeigh and Joel Rifkin, *see King*, 569 U.S. at 450–51—in other words, the balance of law-enforcement and public-safety needs against individuals' rights favors arrest in these circumstances.

But once the arrested person is brought to jail, that more generalized standard of probable has served its purpose: it has detained the person long enough for the jail deputies to confirm his identity as a wanted person. And if we're being candid, that type of roadside probable cause—where the arrested person matches only the wanted person's name, sex, and race—isn't really much of a basis for a *reasonable* belief that the arrested person is actually the wanted individual. So if the Fourth Amendment's guarantee against "unreasonable" seizures has teeth, it requires reasonable identity confirmation before continued detention.

*Third*, the Supreme Court has recognized that blind adherence to past practices can, in the face of new technology, defy constitutional guarantees under the Fourth Amendment. Consider cell phones, for example. In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court held that officers must obtain a search warrant to search a cell phone found on a person at the time of arrest. The Court reached this conclusion even though it continued to recognize an exception to the Fourth Amendment's warrant requirement for searches of other items found on an arrested person. *See id* at 391–92. And in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court declined to apply the third-party

doctrine of *Smith v. Maryland*, 442 U.S. 735 (1979), and *United States v. Miller*, 425 U.S. 435 (1976), under the Fourth Amendment to authorize law enforcement's warrantless obtaining of cell-site records from cell-service providers.[19] *See also*, *e.g.*, *Kyllo v. United States*, 533 U.S. 27 (2001) (rejecting a "mechanical interpretation" of the Fourth Amendment to hold that use of a thermal imager to detect heat radiating from the side of the defendant's home was a search because any other conclusion would leave homeowners "at the mercy of advancing technology").

The same is true here. Blindly allowing arrestees to be detained for days even though new technology allows a jail deputy to reasonably confirm in less than a minute that the detainee is not the wanted person violates the Fourth Amendment's guarantee of security "against unreasonable . . . seizures." U.S. Const. amend. IV.

And *fourth*, historically, federal courts have recognized the importance of identity confirmation early in the criminal-justice process. In this respect, federal courts have treated identification confirmation of at least some type—limited as that ability has been on short notice in earlier times—as critical before a magistrate judge can order a person arrested on a valid warrant transferred to

---

[19] Under the "third-party doctrine," the government, without a warrant, can obtain items like bank records for a subject from a third-party witness like a bank. *See Miller*, 425 U.S. 435. "The third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another." *Carpenter*, 138 S. Ct. at 2219.

another district.  Rule 5, Fed. R. Crim. P. (and its earlier iterations in other rules like Rule 40(a), Fed. R. Crim. P. (2001)), requires magistrate judges to confirm "that the defendant [who appears before her at an initial appearance] is the same person named in the indictment, information, or warrant" before she may transfer that person to the district where the charged offense was allegedly committed.  FED. R. CRIM. P. 5(c)(3)(D)(ii).  This rule is based on years of judicial precedent predating it.  *See* Rule 40, FED. R. CRIM. P. (2001), Advisory Committee Notes, 1944 Adoption ("The scope of a removal hearing, the issues to be considered, and other similar matters are governed by judicial decisions.") (gathering cases).  And it highlights the importance with which courts have long viewed early identification confirmation—even when identity-confirmation avenues were far more limited.

It is also no answer to the continued unreasonable detention of an arrestee when a reasonable identity check would reveal his innocence that the detainee will, at some later point or points, appear before a magistrate judge or other judicial official.  That is so for two reasons.

First, even without considering what might or might not happen in front of the judicial official, insisting that a misidentified person wait until at least her initial court appearance before even the possibility of release still requires the misidentified person to spend days and nights in jail before she gets to go to court.  And for what purpose?  Given the ease with which a jailer can confirm that the arrested person is not the wanted person, the continued seizure

of the person for days and nights is simply unreasonable under the Fourth Amendment.

Second, appearing before a judicial officer provides no guarantee of release when a person has been misidentified and no one has confirmed his identity. And even when it results in release, that release is not immediate. After all, judicial officers don't have the means in court to confirm a person's identity. Rather, all they can do is instruct the government to have the person's fingerprints compared to those of the wanted person. But the deputy cannot do so until after all arrestees have their court appearances and the deputy is able to return to the jail with the arrestees. It makes no sense (and isn't reasonable) that a protesting detainee's identity need not be confirmed until after a judicial officer orders a jailer to do what the jailer reasonably could and should do in the first instance. *Cf. Malley v. Briggs*, 475 U.S. 335, 345–46 (1986) (holding that a reasonably well-trained officer who would have known that his affidavit failed to establish probable cause and that he shouldn't have applied for a warrant violates an arrestee's Fourth Amendment right against unreasonable seizures and does not enjoy qualified immunity when he arrests someone based on the warrant he nonetheless procured from a judicial officer).

Plus, sometimes, as in Sosa's case (where his jailers instructed him that he could not speak), detainees don't know that they can speak at appearances. And even when they do, judicial officers who don't know what the arrestee is going to say and who are trying to protect the arrestee's Fifth Amendment rights often

suggest that the arrestee not speak without conferring first with an attorney—which often, the arrestee will not have. Most people comply in court with what a judge suggests.

Nor does bail solve the problem. Consider Sosa's case. If a judicial officer thinks that a person has been on the run from criminal charges for 26 years and has moved to another state to avoid them, how likely is it that the judicial officer will deem bail a good idea? Plus, even when the court grants bail, it can be days before that happens and a detained person can post it—days in jail (and the potential expenditure of money to be able to post bail) that could have been prevented if the jail deputies ran a simple fingerprint comparison.

Ultimately, the Fourth Amendment promises protection "against unreasonable . . . seizures." U.S. Const. amend. IV. And by any real-world standard, confining an innocent person to jail for days based on no more than that he shares the same name, sex, and race with thousands of others is an "unreasonable . . . seizure[]," *id.*, when a ten-second fingerprint comparison could definitively show he is entitled to release. So I would join the Second and Third Circuits in concluding that the right to be free from continued detention once it was or should have been known that the detainee was entitled to release dwells within the Fourth Amendment's shelter against "unreasonable . . . seizures." *See Russo*, 479 F.3d at 209; *Schneyder*, 653 F.3d at 319–22, 330.

## IV.

*Cannon* and its progeny make this a very easy case: they require us to conclude that Sanchez and the other jail deputies violated Sosa's clearly established substantive-due-process right to be free from continued detention when they knew or should have known that he was entitled to release. But even in the absence of our binding precedent, the Fourth Amendment cannot tolerate detention for days when jail deputies have the means available to definitively and easily determine that the person in custody is not the wanted person. Any other conclusion reads the Fourth Amendment's prohibition on "unreasonable" seizures out of the Constitution. I respectfully dissent.